HARRY C. BROWNE & another *vs.* BROCKTON NATIONAL BANK & others.

Plymouth.   November 9, 1939. — March 28, 1940.

Present: FIELD, C.J., DONAHUE, LUMMUS, DOLAN, & RONAN, JJ.

*Fraud. Corporation,* Corporate entity. *Bona Fide Purchaser. Negligence,* Safe deposit box. *Bills and Notes,* Holder in due course.

Subsidiary findings of a master in a suit to fix a national bank with liability for fraud of the manager of an investment company, which occupied part of the bank's premises for its business and whose officers and directors were also officers of the bank, would not have warranted a conclusion that the company was a sham through which the bank conducted a business not permitted by national banking law.

Conclusions, that an officer of a national bank, who also was an officer of a company conducting an investment security business on premises of the bank, was negligent in accompanying the manager of the investment company to a safe deposit box of the company when he fraudulently took therefrom securities of a customer, would not have been warranted by subsidiary findings by a master.

One, who had permitted a fraudulent person to use his account with his broker without compensation and without knowledge of that person's fraudulent purposes and acts, and who had repurchased from the broker a bond which had been returned to the broker by a purchaser of it for value and without notice of fraud which the fraudulent person by a sale through use of the brokerage account had practised upon a former owner, was not liable to the former owner for its value although at the time of the repurchase he knew of the fraud.

BILL IN EQUITY, filed in the Superior Court on February 12, 1938.

From a decree, entered by order of *Brogna,* J., the plaintiffs appealed.

*H. W. Cole,* for the plaintiffs.

*R. S. Wilkins,* (*F. W. Hibbard* with him,) for the defendants Brockton National Bank and others.

*W. J. Callahan,* for the defendant Leonard.

DOLAN, J.   This is a suit in equity in which the plaintiffs, husband and wife, seek an accounting for the value of certain bonds and stock.   The bill of complaint was

taken as confessed against the defendant Oburg. The other defendants answered. The case was referred to a master who filed his report to which the plaintiffs and the defendants, other than Oburg and Leonard, filed objections. An interlocutory decree was entered overruling the exceptions except as sustained by two modifications, and confirming the report as modified. A final decree was entered establishing the indebtedness of the defendant Oburg to the plaintiffs and ordering payment by him of the sum decreed to be due. The bill was dismissed as to all the other defendants, and the case comes before us on the plaintiffs' appeal from the interlocutory and final decrees.

The findings of fact of the master are in substance as follows: At the time of the acts complained of Fillebrown, the defendant Stacey's testate, was president and a director of the defendant bank. Stacey, who is also a defendant individually, was vice-president of the bank. The defendant Buck's testate, Malcolm R. Buck, and the defendants Keith and Filoon were officers of the bank.

Fillebrown, Stacey, Buck, Keith, and Filoon (who died after the suit was begun) constituted the board of directors of the Brockton National Company of which the defendant Oburg was manager. The defendant Leonard held no office or position in either the bank or the company. Sometime in November, 1931, the plaintiffs, who had no experience in making investments and had about $8,000 in hand, sought the advice of Fillebrown who was then president of the bank and also of the company. The plaintiff Harry C. Browne (herein referred to as Browne) had known Fillebrown for many years and had dealt with him as president of the bank. Fillebrown discussed investments in general terms with the plaintiffs and "then said that he was not as well qualified to advise in the details of . . . investment as someone else in the bank," and he took the plaintiffs to Oburg and introduced the latter as "Manager of the Investment Department."

Oburg had an office on the main floor of the bank. Over the windows to the left of the door leading to his office was an electric sign "with the words Brockton National Co." and

over the windows on the other side there was an electric sign bearing the legend "Investment Securities." The plaintiffs did not notice these signs. They discussed the merits of certain kinds of securities with Oburg who eventually made certain specific suggestions and the plaintiffs ordered certain bonds and stocks. On December 1, 1931, the plaintiffs called at the bank and saw Oburg, who informed them that the price of the securities was $7,864.58 and presented two bills. One was on the billhead of the Brockton National Company for all the securities purchased except ten shares of the stock of the American Telephone and Telegraph Company. The other bill was for this stock and was on a billhead of the bank.

Browne asked Oburg "what the Brockton National Company was." Oburg replied that it was "a device for handling stocks and bonds and that a receipt from the company was as good as a receipt from the bank." Browne wanted to be sure, so he went to Fillebrown and told him he did not understand the Brockton National Company. Fillebrown said, "You are doing business with the bank, a receipt from the company is just as valuable as a receipt issued by the bank." Browne then made certain transfers from his savings account in the bank and gave Oburg a counter check for $7,864.58 payable to the company. Oburg had both bills receipted by the "receipt stamp" of the company, signing each "H. G. Oburg, Mgr." Oburg indorsed Browne's check in behalf of the company, and obtained from the bank two cashier's checks, one for $1,261.25 payable to the bank and the other for $6,603.33 payable to the company. The plaintiffs did not know the method by which the check (of Browne) was split up for payment of the purchase price of the securities.

Oburg suggested to the plaintiffs that the securities be "left with the bank for safe-keeping without charge, the bank to collect the interest and dividends and to deposit them to the plaintiffs' account." The plaintiffs agreed and Oburg gave them receipts of the company for the securities for safekeeping and obtained from them their signatures "on stock transfer powers" in blank in connection with the stocks

that had been purchased.  The bonds purchased were negotiable.  The plaintiffs understood that the "stock powers" were signed for the purpose of receiving credit of "interest and dividends."  The stocks purchased consisted of twenty shares of the First National Bank of Boston, and ten shares of American Telephone and Telegraph Company.  The bank stock was registered at the time of purchase at the plaintiffs' address, but this address was changed on January 7, 1932, to "care of Brockton National Company."  The purchases of all the securities except the telephone stock were made by the company through its correspondent the First National–Old Colony Corporation of Boston.  The telephone stock was purchased by the bank on an order signed by Browne, through Proctor, Cook and Company, a Boston brokerage firm with an office in Brockton.  All the securities except the telephone stock were delivered by the First National–Old Colony Corporation to "Mr. Oburg, care of Brockton National Company" between December 2 and December 7, 1931.  "The bank as distinguished from the company never handled any securities belonging to plaintiffs except . . . [the] telephone stock."  All of the securities, except for the brief period during which the bank had possession of the telephone stock, were kept so long as the company had them in a safe deposit box rented by the company from the bank.  The box was in another part of the bank than that where it kept its customers' securities.  One bank official could obtain access to the place where the bank kept its customers' securities, but access to the box rented by the company could be had only when two persons representing the company were present, usually Oburg and Buck.

As of December 31, 1932, the company was liquidated and ceased to do business, and as of that date Oburg severed all connection with the company and opened an office under his own name a few doors distant from the bank.  This action had been recommended by a vote of the directors of the bank.  At or about that time the plaintiffs received a letter on the stationery of the company, which bore a picture of the bank, in effect recommending Oburg as an investment counsellor.  This letter purported to be signed by Fillebrown

by a rubber stamp. None of the officers of the bank had any knowledge of the issuance of such a letter.

On January 6, 1933, the plaintiffs went to see Oburg at his new office, surrendered to him the safe-keeping receipts of the company, and received from him two receipts, one covering the telephone stock, and the other the balance of the securities. These receipts were marked "Safe Keeping" and were signed by Oburg individually. The securities were not exhibited to the plaintiffs. At the time of this exchange of receipts neither of the plaintiffs had any communication relating thereto with any of the other defendants and neither the bank nor its servants or agents "knew or reasonably should have known" that some of the securities belonging to the plaintiffs had already been sold or otherwise disposed of by Oburg. The securities other than the bank stock and the telephone stock consisted of "$2,000 Consolidated Gas of New York 4½s 1951, $2,000 Commonwealth Edison Company 4s of 1981, and $2,000 American Telephone and Telegraph Company 5s of 1965." On January 9, 1932, Oburg obtained one of the telephone company bonds from the vault where the Brockton National Company kept its securities, and on January 15, 1932, obtained from the vault the Consolidated Gas Company and the Commonwealth Edison Company bonds and disposed of them in the manner hereinafter set forth. This conduct of Oburg did not come to the attention of the plaintiffs until 1937, in the early part of which Oburg went into bankruptcy. The plaintiffs "received from his estate the telephone stock but none of the other securities were found among his effects."

The master found that Oburg was acquainted with the defendant Leonard, who was a farmer living at Raynham. Leonard had trading accounts with the brokerage firm of Proctor, Cook and Company. Late in 1931 Oburg told Leonard that he owned some bonds which he would like to sell and asked Leonard if he could use his account. A rule of the New York Stock Exchange forbade persons in such a position as that occupied by Oburg having trading accounts of their own. Leonard did not know this and gave his per-

mission. On January 9, 1932, Leonard saw Oburg at his office and Oburg went to the vault with Buck, who was an officer of the bank and also treasurer and director of the company. Oburg returned alone to Leonard and handed him one of the $1,000 bonds of the telephone company that had been purchased for the plaintiffs. Leonard sold this bond through Proctor, Cook and Company, which transmitted a check to Leonard for the proceeds of its sale ($996.72). Leonard immediately turned the check over to Oburg. On or about January 15, 1932, under similar circumstances Oburg procured from the vault the Consolidated Gas Company and Commonwealth Edison Company bonds. There was no evidence that upon either occasion Buck participated in or had knowledge of Oburg's wrongful intention regarding the plaintiffs' securities. Oburg asked Leonard to put these bonds on the account for further instructions. Leonard did so and obtained a receipt for them from Proctor, Cook and Company, which he delivered to Oburg. On the same day Oburg started trading "on Leonard's No. 2 account," and purchased securities "for which the plaintiffs' securities, as part of the account, at once became collateral." On July 14, 1932, Oburg procured Leonard to sell these bonds and to allow the proceeds to remain on the account to reduce the debit balance. Leonard complied and the bonds were sold. Later Oburg asked Leonard to get a check for the balance due on the account and Leonard obtained a check for the balance ($858.88) which he indorsed and turned over to Oburg. Leonard received no compensation for the use of his account.

The other $1,000 telephone bond and the twenty shares of stock of the First National Bank were not disposed of through Leonard's account. The bank stock was sold by Oburg on August 18, 1935, through another broker, by use of the stock power that had been signed by the plaintiffs. The telephone bond was surrendered to the telephone company in New York by persons unknown, who received payment therefor. The plaintiffs received credits either in their savings or commercial account for the dividends or interest being currently paid on the securities which they

"thought they owned." The master inferred that these credits were made up of cash furnished by Oburg.

On July 22, 1937, Proctor, Cook and Company received notice from its New York correspondents that one of the Consolidated Gas Company bonds that had been sold on July 14, 1932, had been stolen and a request that it be replaced by one "not tainted." Proctor, Cook and Company notified Leonard, took back the bond in question from its correspondents, and obtained from Leonard a bond which it sold and, with the proceeds and additional cash furnished by Leonard, bought and delivered to its correspondents another Consolidated Gas Company bond. It notified the plaintiffs of this transaction and that it would deliver to Leonard on August 10, 1937, the bond that had been returned to it.

Other conclusions of the master are that the company and the bank were not one and the same but were separate corporate entities with the separation fully preserved; that the plaintiffs' securities were "lost" primarily through Oburg's fraudulent acts; that none of the defendants other than Oburg had any fraudulent intent with respect to the plaintiffs' securities or any knowledge of Oburg's intent; that Fillebrown's reference to the company as the investment department of the bank gave the erroneous impression that the company was a department of the bank, but before the plaintiffs entered into the custody agreement with the company they knew or should have known of its separate corporate identity, yet they were justified in believing from Fillebrown's statement that the company was in some way employed by or subsidiary to the bank; that Fillebrown's statement, "You are doing business with the bank, a receipt from the company is just as valuable as a receipt issued by the bank," further gave the erroneous impression that the bank in some way stood behind the company transactions or operated the company as a subsidiary and Fillebrown undoubtedly believed when he made this statement that transactions with the company were as safe as transactions with the bank "but the facts have proved otherwise"; that (as modified by the interlocutory decree

entered by the judge) "Fillebrown's statements," because of his position as president of the bank, "made against the background of the physical set up, gave the plaintiffs the erroneous impression that they were dealing with a department of the bank"; that the plaintiffs undoubtedly relied on the letter (on the stationery of the company signed in Fillebrown's name with a rubber stamp and in effect recommending Oburg as an investment counsellor) but that it was not shown that the letter came from or had been authorized by Fillebrown or any official of the bank; that the facts found do not lay a basis for finding Buck negligent in allowing Oburg to take the securities from the company's box, since Oburg was a trusted employee whose daily duties required him to handle securities, and that there was nothing to show that any duty to maintain a detailed check upon Oburg's dealings was imposed on Buck; that no facts tended to show that any acts or omissions of Stacey, Filoon or Keith in any way caused the loss of the plaintiffs' property, or that they violated any duty to the plaintiffs; and that neither the acts or omissions of the bank, nor those of any of its officers or employees were the cause of the loss of securities taken from the box by Oburg after the plaintiffs had surrendered the company safe-keeping receipts to him.

The conclusions of the master as to Leonard are as follows: "Leonard by permitting Oburg to use his account made possible the conversion by Oburg on the dates and at the values above stated of $1,000 American Tel. & Tel. Co. 5s of 1965, $2,000 Consolidated Gas of New York 4½s of 1951, and $2,000 Commonwealth Edison Co. 4s of 1981. However, Leonard knew Oburg and trusted him. He had no reason to know or suspect that Oburg intended to use his account for a fraudulent purpose. His knowledge of the rules of the stock exchange and the mechanics of finance was not such as to put him on notice that the use of the account was irregular. A more astute person might have been led to make further inquiries on seeing a large volume of sales and learning of a debit balance on his account, but he did not do so. If he was under no duty to the plaintiffs

to make further inquiries, then, so far as it is a question of fact, he was not negligent."

With relation to the defendant bank, the plaintiffs assert that the master's finding that the company and the bank were not one and the same but separate corporate entities with the separation fully preserved, is not supported by the subsidiary findings. They ask that the principle be invoked that permits a disregard of corporate entity where one corporation is but a sham and a means by which another corporation perpetrates a fraud, [see *Hallett* v. *Moore*, 282 Mass. 380, 399; *New England Theatres, Inc.* v. *Olympia Theatres, Inc.* 287 Mass. 485, 493,] and contend that the history of the organization and operation of the company show that it was a mere instrument by which the bank dealt in securities, a business from which the bank as a national banking corporation was barred. In this connection the master found that in 1927, after conferences between officers of the bank and of the Old Colony Corporation, later The First of Boston Corporation, a deposit and trust agreement was made for the purpose of organizing a corporation to deal in securities. The name of an already existing corporation was changed to that of "Brockton National Company." The trustees under the deposit and trust agreement acquired, on behalf of certain stockholders of the bank, about one half of the stock of the company with the right to vote the stock. The Old Colony Corporation also acquired about one half of the stock of the company. The defendants previously mentioned as officers of the company were elected to their offices. Although the trustees issued a single and inseparable receipt certificate for units consisting of one share of bank stock and one share of stock of the company, the stockholders of the company never included all the stockholders of the bank, and the bank never owned any stock in the company. Meetings of the company were held in the "bank directors' room" and were generally presided over by Fillebrown. At all the annual meetings except one, the proxy of the Old Colony Corporation or its successor was held by the defendant Stacey.

Matters such as common directors and officers, and the use by the company of part of the premises of the bank in the conduct of the business of the company, are not conclusive. The important question is whether the bank used the company as an instrument to achieve an illegal purpose. *Marsch* v. *Southern New England Railroad,* 230 Mass. 483, 497. *Finnish Temperance Society Sovittaja* v. *Finnish Socialistic Publishing Co.* 238 Mass. 345, 355. *New England Theatres, Inc.* v. *Olympia Theatres, Inc.* 287 Mass. 485, 493. See *Merrimac Chemical Co.* v. *Moore,* 279 Mass. 147, 157. While the master found that Fillebrown, the president of the bank, told the plaintiffs that Oburg was "manager of the investment department," that the plaintiffs were doing business with the bank, and that a receipt from the company was just as valuable as a receipt issued by the bank, the last part of the statement nevertheless emphasized that the bank and the company were separate entities and is not to be regarded as more than an expression of the opinion of Fillebrown, *People's Savings Bank* v. *James,* 178 Mass. 322, 325, who would have been without authority to hold out the bank as engaged in the buying and selling of securities for profit. See U. S. C. Sup. IV, Title 12, § 24. A national bank is not authorized to engage in "the business of buying and selling stocks, as a source of revenue or profit, which would subject the capital contributed by the stockholders to the hazards of speculation, independently of the ordinary risks of banking." *Hotchkin* v. *Third National Bank of Syracuse,* 219 Mass. 234, 237. U. S. C. Sup. IV, Title 12, § 24. Moreover, Oburg's office on the bank's premises carried the sign of the company, not that of the bank. The company's bills for securities purchased were on separate billheads, and the two corporations were treated as separate and distinct from each other. The master's finding that, although the plaintiffs, by Fillebrown's statements, were justified in believing that the company was in some way "employed by or subsidiary to the bank," they knew or should have known of the separate corporate identity of each, is consistent with his subsidiary findings. These findings do not warrant a conclusion that the company was a

sham or used to perpetrate a deception to defeat a public policy. See *New England Theatres, Inc.* v. *Olympia Theatres, Inc.* 287 Mass. 485, 493.

The plaintiffs have also argued that the bank is chargeable with negligence since Buck, one of its officers, accompanied Oburg to the safe deposit box when Oburg took the plaintiffs' securities therefrom. This contention, however, overlooks the facts found by the master that Buck was a director of the company that rented the box from the bank, which box was located in a different place from that in which the securities of the bank's customers were deposited, and that the safe-keeping receipts at those times held by the plaintiffs were those of the company and not those of the bank. Under all the circumstances we think that neither the representatives of the estate of Buck nor the bank can be held liable for the fraud of Oburg.

The master's finding that the individual defendants as officers of the bank or of the company did not know of or participate in the fraud of Oburg is supported by the subsidiary findings, as is his conclusion that none of the acts of the individual defendants caused the plaintiffs' loss. There are no findings that Oburg advised any of the other defendants of his fraudulent purposes. He had been recommended as a capable and honest worker by responsible persons. The defendants had no reason to view him with suspicion. It cannot be said that they were at fault in permitting him to be in control of the plaintiffs' securities. He was the manager of the company especially created to deal in securities and so was the proper person to be in control. There is no support in the findings of the master for a conclusion that the bank or its officers held out Oburg as the bank's agent, in view of facts found, which should have served to warn the plaintiffs that Oburg was manager of the company, and that the latter was distinct from the bank.

The plaintiffs contend that they are entitled to the "return" of the Consolidated Gas Company bond now in the custody of Proctor, Cook and Company. This contention cannot be sustained. Since Leonard was not a knowing party to the original wrong, and the bond was returned to Proctor,

Cook and Company by a purchaser for value without notice, Leonard in repurchasing the bond acquired the rights of the innocent purchaser, even though when he repurchased the bond he knew of the theft. G. L. (Ter. Ed.) c. 107, § 81. *Fidelity & Deposit Co. of Maryland* v. *Taunton*, 303 Mass. 176, 179, and cases cited. Among the rights so acquired by Leonard was title to the bond.

In view of what has already been said it is unnecessary to decide whether the suit is barred under the provisions of G. L. (Ter. Ed.) c. 197, § 9, as against the executor of the will of Fillebrown and the executrix of the will of Buck, or by the general statute of limitations as against Leonard.

*Decree affirmed with costs.*