LAURENCE MINOT & another, administrators, & others *vs.* GEORGE BURROUGHS & others, JOHN G. PALFREY & another, trustees, & others, intervening petitioners.

Suffolk.    October 20, 21, 1915. — May 15, 1916.

Present: RUGG, C. J., LORING, CROSBY, PIERCE, & CARROLL, JJ.

*Voluntary Association. Syndicate. Words,* "Underwriting," "Syndicate," "Good faith."

A dock property in East Boston was purchased by subscribers to an "underwriting syndicate" organized under an agreement in writing. By the syndicate agreement the subscribers appointed two syndicate managers, who were given "as full power over any and all the securities, real estate, property rights, privileges and franchises which they may at any time acquire, or which may at any time be controlled by them, as if they were the owners thereof," including the power to mortgage, pledge or sell the whole or any part of such securities and property. It was provided that, "In consideration of the rights herein granted and of the premises, said Syndicate Managers will endeavor in good faith to accomplish the purposes of this undertaking." The plan set forth in the syndicate agreement was to acquire the dock property at a price deemed to be less than its value and to sell it again at its greater true value to a real estate trust, to be organized by the syndicate, whose shares were to be sold to the public. The syndicate managers issued to the subscribers syndicate receipts, and with the money subscribed bought the dock property and conveyed it to trustees, who in return therefor issued to the managers five thousand shares of the par value of $100 each of dock trust stock. The managers then formed an operating corporation, to which the trustees leased the dock property for a term of thirty years at a rent sufficient to enable the trustees to pay all expenses, to reduce somewhat a mortgage on the trust property and to pay dividends on the dock trust stock at the rate of five per cent per annum. The managers then sold for cash at par fifteen hundred and ninety-eight shares of the dock trust stock. In spite of considerable expenditures for improvements the operating corporation for three years incurred a substantial deficit. The trustees wrote to the mana-

gers that the trustees would be obliged to reduce the dividends on the dock trust stock to three per cent unless two thousand of the shares, which were held by the managers unsold, should be deposited with the trustees as collateral security for rent and other charges. Thereupon a pledge agreement was made between the managers and the trustees, whereunder two thousand shares of the dock trust stock were deposited by the managers with the trustees to be held until referees should determine that the operating company had demonstrated its capacity to earn sufficient net income to pay its rent or that certain other things had happened, and, if the return of the two thousand shares should not be authorized thus, then the trustees might at the termination of the lease cancel the two thousand shares and reduce to that extent the capital of the trust. The return of the shares thus held as collateral was not authorized in any of the ways provided, and the lease was terminated by the trustees for non-performance of its obligations by the operating corporation. Thereupon holders of syndicate receipts, some of whom had bought them much above par, and none of whom had notice of the pledge agreement until long after its execution and the making of the pledge, brought a suit in equity against the managers and the trustees to set aside the pledge agreement and to require the return of the two thousand shares to the syndicate managers. On an intervening petition certain holders of dock trust shares were admitted as defendants and contended that the pledge agreement was within the power of the managers and involved no breach of duty by the trustees. There was no contention that there was any actual bad faith on the part of the managers. *Held,* that the making and performance of the pledge agreement without notice to the holders of the syndicate receipts were clearly within the broad powers given and intended to be given to the syndicate managers, and that there was no failure of duty on the part of the trustees, who indeed had assumed no obligations toward the holders of syndicate receipts.

In the suit above described it appeared that by an express provision of the syndicate receipts every holder of them became a party to the underwriting agreement and was "bound accordingly," and it was *held,* that the fact that some of the plaintiffs had purchased their syndicate receipts at high prices was of no consequence, as each purchaser became a joint adventurer in the syndicate speculation with all its possibilities of loss as well as of profit.

In the same case it also was *held,* that the mere fact that the pledge agreement might not be concluded before the expiration of the syndicate did not show that the powers of the managers were exceeded in making it, and that there was nothing to indicate that there could not be a distribution of the assets of the syndicate when it expired, subject to the pledge agreement, if that still should be in force.

In the same case it was *held,* that, although neither the managers nor the trustees were under any legal obligation to keep the capitalization of the trust within the limits of its actual earning capacity, yet the attempted execution of a purpose to accomplish this result, so far from being a breach of trust, was an attempt on the part of the managers to carry out in good faith what was deemed by the trustees to be a moral obligation. Moreover certain facts indicated that the pledge agreement was advantageous to the syndicate venture in a business way.

In the same case it was *held,* that the rule against perpetuities had no application to the pledge agreement.

It also was *held* that the pledge agreement under the circumstances disclosed was not contrary to the rule against restraints on alienation.

In the same case, a cross bill having been filed by the trustees against all the other parties to the suit, praying that the two thousand shares of the dock trust held by them as collateral might be cancelled, it was *held*, that the relief prayed for in the cross bill should be granted, and that the principal bill should be dismissed with costs to the defendants but not to the intervenors.

In the case above described, in which the rights of the holders of syndicate certificates depended upon the terms of an "underwriting agreement," it was *said* that the word "underwriting" used in this connection means simply that the persons joining in the scheme agree to furnish the necessary money and to take the shares which are not bought by the public, and that the word "syndicate" used in this connection means an association of persons with a community of interest in the fund raised for carrying on the particular undertaking.

RUGG, C. J.   This controversy * grows out of a scheme for the promotion of a real estate trust of dock property in East Boston. The defendants Burroughs and DeBlois, having ascertained that dock property, which they believed and which the master has found they were justified in believing was worth $1,250,000 or more, could be bought for $950,000, formed the design of acquiring it at that price for the purpose of reselling it at its actual value to a real estate trust to be organized by them, whose shares they proposed to sell.

In order to get the money with which to execute the general scheme, they organized an "underwriting syndicate" so called, by a written agreement, dated October 12, 1904. Its substantial provisions, after reciting the price at which the dock property could be bought, including their services as a part of its cost, and their purpose to buy it and to sell it again to a real estate trust, and to sell the shares of such trust, set out that each subscriber should contribute on demand the amount subscribed by him; that Burroughs and DeBlois should be the managers with full powers, and should issue receipts, transferable upon their approval, to subscribers, and that the agreement should expire, if not extended, on December 1, 1906. The property was subject to a mortgage of $750,000. Burroughs and DeBlois, hereafter referred to as the managers, proposed to charge $50,000 as compensation for all their services in the enterprise. The sum needed, therefore, was $250,000, being $200,000 in cash and their commission of $50,000. This amount was subscribed, the man-

---

* This suit in equity was brought in the Supreme Judicial Court and was reserved by *Braley*, J., for determination by the full court.

agers subscribing more than their commission, and was paid as demanded. For these contributions the managers gave semi-negotiable syndicate receipts or certificates. With the money thus obtained they bought the equity of the dock property above the mortgage. In furtherance of the scheme, it was necessary for the managers to secure trustees to hold the title to the dock property. After negotiation, the defendant Codman agreed to serve, with the privilege of selecting his associate.

The dock property was conveyed by the managers to the trustees, who in return therefor issued to the managers five thousand shares, each of a face value of $100, of National Dock Trust stock, so called. This was consummated on December 14 and 15, 1904.

If the managers could realize their expectation of selling these shares to the outside public at par, the other syndicate subscribers in substance would recover their original investment, together with a return of one hundred per cent profit on their venture, while the managers would get a like return on their cash investment and also their commission of $50,000 together with a profit on it of one hundred per cent. These percentages of profit were somewhat reduced later by the purchase by the managers of new shares of dock trust stock issued at par for money with which to improve the dock property and reduce the mortgage upon it. But, in any event, the anticipated profit was very large.

In order to make it clear that the dock trust had an assured income sufficient to pay five per cent on its shares, the managers formed a corporation known as the operating company, all the shares of stock in which they owned. That corporation was organized to carry on the business for which the dock property was adapted. It leased that property from the trustees for a term of thirty years at a rental sufficient to enable them to pay all expenses, to reduce somewhat the mortgage, and to pay dividends at the rate of five per cent annually on the shares of stock issued by them. Thus the ultimate success of the whole scheme depended upon the ability of the operating company to earn enough to meet its obligations. Codman received from the syndicate managers on December 22, 1904, a letter agreeing that they would sell none of the trust stock without the permission of the trustees, it being understood that permission would be given when the operating company was shown to be a satisfactory tenant, able to

meet its obligations under the lease; and it further being intimated that possibly some of the stock of the trust might be reduced by cancellation if necessity required, so that its capitalization would be justified by its earnings. Permission subsequently was given by the trustees to the syndicate managers to sell all the shares except eighteen hundred, which were to be held till the trustees were satisfied further of the earning capacity of the operating company. Up to March, 1908, the managers sold for cash at par fifteen hundred and ninety-eight shares of the trust. The underwriting agreement was extended from time to time until December 1, 1910.

In general under this scheme the managers were charged with the duty, so far as concerned the subscribers to the syndicate, of marketing the shares of the trust at the highest price. Broadly, they were clothed with all necessary powers to this end. They had held the title to the dock property. They arranged for trustees to take that title and issue to them all the trust shares. The trustees were a means to that end.

It was essential to the success of their scheme that the managers should be able to sell the trust shares for money to the public. Manifestly this could be accomplished only by convincing the public that the trust shares were a good investment. This could be demonstrated only by showing that the operating company was a tenant able to pay its rent.

Genuine efforts to insure the success of, the operating company were made by considerable expenditures for improvements and by securing railroad track connections and otherwise. Nevertheless, the operating company had suffered a substantial deficit for three years. On March 5, 1908, the trustees wrote to the managers that they would be obliged to reduce the dividends on the trust shares to three per cent unless two thousand of these shares were deposited with them as collateral security for the rent and other charges. At this time the managers had not sold and still owned a large part of the trust shares. In consequence of this letter a pledge agreement was made between the trustees and the managers on March 18, 1908, whereby two thousand trust shares were deposited with the trustees by the managers, to be held until it should be determined by referees (a) that the operating company had demonstrated its capacity to earn sufficient net income to

pay its rent, or (*b*) the lease should be assumed or guaranteed by some responsible person of sufficient financial ability to meet its requirements, or (*c*) the real estate of the trust should be conveyed to or over ninety per cent of the trust shares be acquired by some one new person; and, if return of the two thousand shares should not be thus authorized, then the trustees might, at the termination of the lease to the operating company, cancel the two thousand shares and to that extent reduce the capital of the trust. The return of the collateral has not been authorized as provided in this pledge agreement. The lease has been terminated by the trustees for non-performance of its obligations by the operating company as lessee. The pledge agreement was executed by the managers without notifying the holders of syndicate receipts and with the knowledge that some of the plaintiffs would not assent to it. An extension of the "underwriting agreement" since has been signed by the plaintiffs in ignorance of the existence of the pledge agreement.

The syndicate receipts or certificates were sold in the market at times considerably above their face value, and some of the plaintiffs paid for them as high as one hundred and sixty and a quarter per cent of their face value. The venture which seemed to promise such a handsome profit to the syndicate receipt holders has turned out disappointingly.

This suit is brought by holders of syndicate receipts to set aside this pledge agreement on the ground that it is null and void, and to order the two thousand shares thus pledged to be returned to the syndicate managers. It is conceded that, in fact, all the parties have acted in good faith.

In the light of these facts, the main contentions of the several parties are these: The plaintiffs contend (1) that the managers were guilty of a breach of trust in turning over the two thousand shares of the dock trust stock under the pledge agreement and that the trustees took these shares with notice and without value; (2) that the trustees obtained the pledge agreement and the surrender of these shares by exerting wrongfully the power which their position as trustees gave them to the disadvantage of one group of their *cestuis que trustent* for the benefit of another group and that therefore they cannot take any advantage thereby; and (3) that the pledge agreement is invalid in other respects.

The trustees and the intervening petitioners, being some of the general public outside the holders of syndicate receipts, who have purchased and are owners of dock trust shares, contend that the pledge agreement was within the power of the managers and involved no breach of their own duty as trustees for all holders of dock trust stock. The managers, as stated in their brief, "are to the largest possible extent neutral in the case at bar," but in general contend that they had power to execute the pledge agreement.

The decision of these contentions depends upon the powers conferred and the duties and obligations imposed upon the managers and the rights secured to the certificate holders by the "underwriting agreement." The pertinent paragraphs of this agreement are printed in a footnote.* The plain purpose of this agree-

---

\* "(3) Said Syndicate Managers shall have as full power over any and all the securities, real estate, property rights, privileges and franchises which they may at any time acquire, or which may at any time be controlled by them, as if they were the owners thereof, including the power to mortgage or pledge, at their discretion, or to sell the whole or any part of said securities, real estate, property rights, privileges, and franchises for cash or credit, or to exchange the same or any part thereof for stock in any corporation, voluntary association, or real estate trust on such terms and conditions as they may deem expedient, and they shall have full power to organize such corporations, voluntary associations, real estate trusts, or other business associations as may in their discretion be advisable to accomplish the purposes hereof, and may cause to be transferred to any of such organizations the whole or any part of the securities, real estate, property rights, privileges, and franchises which may come into the possession or control of said Syndicate Managers, with further power to vote upon any stock held by them, to sell the same at public or private sale for cash or credit or to exchange the same for stock of any other real estate trusts, corporations, or voluntary associations upon such terms and conditions as they deem expedient whenever they see fit, or to pledge any stock held as security for loans and to invest the proceeds, and they shall have full power to make such agreements of whatever kind as may in their discretion be advisable to accomplish the purposes hereof. The securities and property held by them at any time may be sold wholly or in part to the subscribers hereto.

"The enumeration of the specific powers in this agreement shall not be construed as limiting the general powers of discretion intended to be granted said Syndicate Managers, but they are expressly given the power to do anything necessary or proper, in their opinion, to carry out the purposes of this agreement or to promote the best interests of the syndicate. The Syndicate Managers shall not be liable except for want of good faith, and the rights vested in the Syndicate Managers are vested in the firm as the same may from

ment was to confer upon the managers the widest possible powers. Scarcely any form of words could vest a more unlimited potentiality than do those here employed.

The rights of the holders of the syndicate certificates depend upon the terms of the "underwriting agreement." The subscribers are referred to as forming a "syndicate." The promoters are termed "syndicate managers" and the venture is called a "syndicate." These words are employed widely in the dialect of finance. The word "underwriting" simply means that the persons joining in the scheme agree to furnish the necessary money and to take the shares which cannot be sold to outsiders. A "syndicate" in this connection means an association of persons with a community of interest in the fund raised for the purpose of carrying on the particular undertaking. The members share the profits and bear the losses in proportion to their respective interests. The underwriting syndicate was simply an association of those who furnished the money to make the purchase with an

---

time to time be constituted. Nothing herein contained shall be construed as creating any trust or obligation in favor of any one other than the subscribers nor any obligation in their favor except as herein especially provided.

"(4) The Syndicate Managers . . . may from time to time pay *pro rata* to the subscribers dividends from the cash to the credit of the syndicate, or may in their discretion pay dividends by distributing securities among the subscribers at any time before or upon the expiration of the syndicate, and after payment of all expenses they may divide the securities and property in their hands *pro rata* among the subscribers, or may, in their discretion, convert all the property and securities into cash and distribute such cash among the subscribers *pro rata.*"

"(6) This agreement shall expire on the first day of December, 1906, unless the purposes of this instrument have not been accomplished at that time, in which case this agreement may be extended with the consent of a majority in amount of the subscribers, and may, in the discretion of the Syndicate Managers, be terminated earlier if, in their opinion, its purposes have been accomplished or if they deem it inadvisable for the syndicate to continue longer in existence. Upon the termination of the trust the accounts of the Syndicate Managers shall be audited by the Eastern Audit Company of Boston, or some representative selected by said Audit Company, and the approval of said Audit Company or its representative shall operate as a final discharge of the Syndicate Managers from all further responsibility.

"(7) In consideration of the rights herein granted and of the premises, said Syndicate Managers will endeavor in good faith to accomplish the purposes of this undertaking."

agreement that the managers should have full control of the venture and divide the proceeds or assets among the members of the
association in proportion to their financial interests.   So far as
concerned each other, their relations and rights were analogous to
those of copartners.   *Hambleton* v. *Rhind*, 84 Md. 456, 487.   *Tyser*
v. *Shipowners Syndicate,* [1896] 1 Q. B. 135.   *Morrison* v. *Earls,*
5 Ont. 434, 476.   Their powers with respect to each other were
not those of partners.   Indeed, it is expressly provided in the
agreement that the subscribers shall not be partners.   But respecting the vital point of sharing profits and bearing losses in
proportion to investment, the association bears the earmarks of a
partnership.   But whether, as between themselves, they were
simply beneficiaries under a trust or *quasi* partners is not involved
in the issues here presented.   The holders of syndicate receipts
or certificates get no mysterious advantage out of the use of these
phrases.

It is not necessary for the decision of this case to determine the
precise technical character of the managers, whether they were
trustees or agents.   See *Williams* v. *Milton,* 215 Mass. 1; *Frost*
v. *Thompson,* 219 Mass. 360, 365.   The extent of their powers,
so far as here material, is the same whatever may be their correct
name.

It is manifest that for the success of a scheme like this the largest
powers on the part of the managers might be essential.   It is difficult to conceive of phrases which would express a more comprehensive grant of power than that created by the underwriting
agreement.   The absolute control of the whole affair was vested in
the managers.   Owners in fee, so far as concern the direction of the
enterprise and the means to be used, could have no larger authority
than was conferred upon the managers.   They were exempted from
every liability except "for want of good faith."   They were required
to issue receipts showing the interests of the subscribers.   They
were empowered, upon the expiration of the syndicate, to distribute the assets, but a broad discretion was conferred in this
respect.   The only other obligation resting upon them was to
"endeavor in good faith to accomplish the purposes of this undertaking."   The "purposes of this undertaking" were to make as
much money as rightly could be made out of the speculation.
The words "good faith" in this connection probably were used in

their common signification of acting honestly and without purpose to defraud. *Lufkin* v. *Lufkin*, 182 Mass. 476. *Tatam* v. *Haslar*, 23 Q. B. D. 345. *Searl* v. *School District Lake County*, 133 U. S. 553, 563. *Pierce* v. *O'Brien*, 189 Mass. 58. See also *Warren* v. *Pazolt*, 203 Mass. 328, 347; *Burns' Case*, 218 Mass. 8, 10. But whatever may be the shade of meaning attributable to "good faith," it does not under these conditions require sound judgment and business sagacity. There is no contention that there was actual bad faith on the part of the managers.

The managers were entitled to do with the assets of the syndicate whatever in good faith, acting within the general purpose of the agreement, they thought would be likely to bring the largest profit to the holders of syndicate receipts. The honest exercise of their good judgment is not made subject to approval by the receipt holders, or to review by anybody. The effect of the immunity clause, see *Dreyfus* v. *Old Colony Trust Co.* 218 Mass. 546, 555, and cases cited; *Tuttle* v. *Gilmore*, 9 Stew. 617, 622; *Industrial & General Trust Ltd.* v. *Tod*, 170 N. Y. 233; *Warren* v. *Pazolt*, 203 Mass. 328; *Perrins* v. *Bellamy*, [1899] 1 Ch. 797, need not now be discussed, because, for reasons to be stated, it seems plain that these managers did not go outside the scope of the scheme with the execution of which they were entrusted. *Gisborne* v. *Gisborne*, 2 App. Cas. 300. *Tempest* v. *Camoys*, 21 Ch. D. 571. *Perrins* v. *Bellamy, supra.*

The selection of trustees to hold the title to the dock property was among the powers reposed in the managers. It was desirable, if not imperative, to secure persons to act in this capacity in whom the public would have confidence. One important factor in the equipment of trustees for such an enterprise well might be a reputation for seeing that there was no "water" in the capitalization of the trust. It would be the desire of all high minded men, managers as well as trustees, that there should be no sale of trust stock which did not represent actual value. This subject was discussed at the outset between the managers and the trustees. Although not made a part of the initial or any subsequent agreement, the attitude of the trustees on this matter was thoroughly understood by the managers. It hardly could be contended that, if an agreement to this end had been made at the start, it would not have been within the power both of managers

and trustees. The powers of the managers were not affected as the events proceeded. There was not at any time an attempt to change the terms of the underwriting agreement. So far as the managers made reports or representations to the holders of syndicate receipts, these did not modify in any way the terms of the underwriting agreement. If these reports have any effect, they can extend no further than the relations between the receipt holders and the managers. Their power to deal with the trustees and with the property held by them under the underwriting agreement was not narrowed. If, during the progress of their "endeavor in good faith to accomplish the purposes of this undertaking," it seemed to the managers wise, in the exercise of their honest judgment, to make the pledge agreement for direct assurance of the purpose that there should be no capitalization of the trust beyond the real and current earning value of the property without depending upon the uncertain potentiality of the future, such agreement was within their power.

The holders of syndicate receipts or certificates had embarked upon a financial speculation under an express agreement. They had entrusted the conduct of that speculation to the managers. They cannot stop half way on that voyage, before the purposes of the undertaking are accomplished, and ask to have some of the courses, laid by the managers in good faith, reversed and new courses taken contrary to the judgment of the managers. They are bound by the terms of their agreement as to the speculation.

The holders of the syndicate certificates have no direct relation to the trustees. Their rights under the syndicate agreement are wholly with the managers. So long as the managers do not exceed the power conferred upon them by the underwriting agreement, the holders of syndicate receipts cannot look beyond the managers. The trustees assume no obligations toward the holders of syndicate receipts. Their relations are wholly with the holders of trust receipts. In this respect the managers are the exclusive representatives of the syndicate receipt holders. So long as the managers do not exceed their powers under the underwriting agreement, the syndicate receipt holders cannot break through its terms. They are bound inexorably by the conduct of the managers within the ambit of that agreement.

The circumstance that some of the plaintiffs bought syndicate receipts at a rather high price is of no consequence in this connection. By the express terms of these receipts every transferee "becomes a party to said [the underwriting] agreement and is bound accordingly." Every transferee bought into the syndicate speculation with all its possibilities for loss as well as profit. He did not buy shares of the dock trust, but became a joint adventurer in the speculation.

The time limited in the original agreement has been extended and has now expired. But the managers were not required to convert all the assets of the syndicate into cash or into free shares of the dock trust at any given time. They could divide the securities and property in their hands among the subscribers. They were only required to "endeavor in good faith to accomplish the purposes of this undertaking."

The mere fact that the pledge agreement might not be concluded before the expiration of the syndicate does not show that the powers of the managers were exceeded. It doubtless was expected by the managers that the dock trust stock would be released from the pledge before the expiration of the underwriting agreement. Apparently such an expectation might have been well founded, for after it was made there was a brief period of prosperity. Moreover, there is nothing to indicate that there could not have been a division of the assets of the syndicate when it expired, subject to the pledge agreement, even if that were still in force. See *Bradley* v. *Borden, ante,* 575.

It may be assumed that the managers did not undertake toward the purchasers of trust stock a promoter's liability, and that neither the managers nor the trustees were under legal obligation to keep the capitalization of the trust within the limits of actual earning power. But the execution of a purpose to accomplish this result, even though not required by legal obligation, falls far short of being a breach of this trust.

There is much to be said in favor of a design on the part of promoters of such a scheme as this to prevent watering of the stock and to maintain a parity between the face value of the shares and their market value dependent upon the earnings of the property represented thereby. It was not a breach of the underwriting agreement for the managers to attempt to satisfy what was

deemed a moral obligation and to carry out in good faith an understanding of the trustees which may have been nebulous and unenforceable and yet deemed to be in accordance with the requirements of business probity. The maintenance of an ethical standard so high as to outrun legal obligation is not incompatible with the underwriting agreement.

There was an advantage, or what well might have seemed a business advantage, accruing to the syndicate from the pledge agreement, in that the managers were enabled thereafter to market a considerable number of shares of trust stock to the outside public. This result hardly could have been accomplished if the dividend had been reduced to three per cent. As a result of the pledge agreement, the earlier agreement that eighteen hundred shares should be withheld from sale was abrogated.

The circumstances under which the pledge agreement was made show that it was not unreasonable. The facts stated in the trustees' letter to the managers of March 5, 1908, preceding the pledge agreement, were true and warranted, if they did not require, the reduction of the rate of dividends on the dock trust stock from five to three per cent. It was the purpose of the trustees to make the reduction unless the pledge agreement was made. While the trustees probably could not agree to pay dividends or in any way to bind their hands so as not to act at all times for the interests of the trust, *Weller* v. *Ker*, L. R. 1 H. L. (Sc.) 11, yet the pledge agreement gave every practical assurance that the rate of dividends would not need to be cut in the immediate future. It afforded to the managers opportunity to market a further considerable amount of dock trust stock. It apparently almost enabled them to float the entire venture and to release the stock held under the pledge agreement. These were or well may have been thought advantages to the syndicate.

It was not necessary for the managers to get the consent of the certificate holders to any plan of action within the scope of the powers conferred upon them. The underwriting agreement expresses the idea that the whole success of the venture might depend upon a continuous concentration of absolute power within its general scope in an harmonious honest management, free from the possibility of interference from conflicting views on questions

of expediency. The managers, acting in good faith, obviously were intended to be masters of the affair.

The pledge agreement is not obnoxious to the rule against perpetuities. The equitable interest in the shares was at all times vested in the managers. It was not to be changed except (1) when the legal title also should be revested in the managers, or (2) when the shares should be cancelled and thus extinguished. There is no interest to spring into being at some period beyond the time fixed by the law for the benefit of an uncertain person or class. The rule does not apply to such vested interests as here are disclosed. Gray, Rule against Perpetuities, (3d ed.) §§ 205, 322. *French* v. *Old South Society*, 106 Mass. 479, 488. *Seamans* v. *Gibbs*, 132 Mass. 239. *Winsor* v. *Mills*, 157 Mass. 362, 365. *Howe* v. *Morse*, 174 Mass. 491. Nor is the pledge agreement under the circumstances here disclosed contrary to the rule against restraints on alienation or to anything decided in *Southard* v. *Southard*, 210 Mass. 347, 356, 357, as applied to these facts.

The pledge agreement was not capricious, was within the powers of the managers and in itself violated no rule of law.

It follows that under the terms of the underwriting agreement the plaintiffs do not show that they are entitled to any relief. They are entitled to none against the managers, for the managers have acted in accordance with their power. They are entitled to none against the trustees, for the trustees owed them no duty. Their only duty was to the managers as holders of trust receipts, and the managers, acting within the scope of their powers, have assented to all that the trustees have done.

It becomes unnecessary to discuss the other points raised and contentions presented, for what has been said shows that no ground for equitable relief is open to the plaintiffs upon this record.

A cross bill has been filed by the trustees against all other parties to the suit, praying that, the lease to the operating company having been terminated, the two thousand shares held by them under the pledge agreement be cancelled. It is an inevitable result of the grounds upon which this opinion rests that a decree should be in accordance with the prayer of this cross bill.

It follows from what has been said that a decree should be entered overruling the exceptions to the master's report and confirming that report, and dismissing the plaintiffs' bill with costs to the defendants but not to the intervenors, and that upon the cross bill of the trustees a decree should be entered declaring that the two thousand shares in the dock trust held by them under the pledge agreement be cancelled.

*So ordered.*

*R. D. Weston,* (*H. M. Channing* with him,) for the plaintiffs.

*A. D. Hill,* for the defendants Codman and Gardiner.

*R. Homans,* for the intervening petitioners.

*R. W. Hale & H. H. Bundy,* for the defendants Burroughs and DeBlois, submitted a brief.