MARY AGNES McCARTHY *vs.* BROCKTON NATIONAL BANK.

Suffolk.    April 6, 1943. — June 30, 1943.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & RONAN, JJ.

*Deceit. Fraud. Agency*, Scope of authority or employment. *Corporation*, Officers and agents, Ultra vires. *Bank and Banking. National Bank. Proximate Cause. Damages*, For tort. *Interest.*

Evidence of conduct of the president of a national bank respecting transactions of a woman customer of the bank with an investment corporation organized by the bank and doing business on the bank's premises warranted a finding that he was acting within the scope of his apparent authority, and bound the bank, when he stated to the customer, after the liquidation of the investment corporation, that one, who had been its manager and with whom she had dealt upon the president's assurance that he was a manager of the investment department of the bank, still was working for the bank so far as the bank's customers were concerned and that the bank "stood behind everything he said or did."

Ultra vires was not a defence to an action to recover from a national bank damages sustained by reason of fraud of one of its officers acting within the scope of his authority even if the fraud was perpetrated in a transaction in which by statute the bank was not authorized to engage and it derived no benefit therefrom.

Misrepresentations made to a customer by the president of a national bank within his apparent authority and with intent that the customer

should act in reliance thereon, to the effect that a certain person to whom the president advised delivery of negotiable securities was working for the bank so far as its customers were concerned and that the bank "stood behind everything he said or did," warranted a finding for the customer in an action of deceit against the bank for loss sustained by the customer through defalcation by that person, to whom he had delivered securities without knowledge of the falsity of the representations and in reliance on them and on the advice so given.

A finding was warranted that deceitful statements, made by the president of a bank to its customer to the effect that a certain person whom he advised the customer to entrust with negotiable securities was an employee of the bank and that it "stood behind everything he said or did," were the proximate cause of loss sustained by the customer through defalcations of such person after delivery of securities to him.

At the trial of an action for deceit against a national bank, evidence of transactions of the plaintiff, a customer of the bank, with a certain person over a period of years on the strength of deceitful representations by the bank's president that such person was an employee of the bank and that it "stood behind everything he said or did," did not warrant a finding of damage sustained by the plaintiff until a transaction resulting in loss to him through a defalcation by such person after the plaintiff had entrusted him with securities in reliance upon such representations; and the measure of damages for such loss was the market value of the securities at the time they were delivered to him by the plaintiff.

Damages consisting of the value of securities lost as a proximate result of deceit of the defendant might be increased by the addition of interest in the discretion of the jury.

CONTRACT OR TORT.   Writ in the Superior Court dated July 13, 1939.

The case was tried in the Superior Court before *Greenhalge*, J., and a verdict was returned for the plaintiff on a count for deceit.   The defendant alleged exceptions.

*R. S. Wilkins*, for the defendant.

*T. H. Mahony*, for the plaintiff.

RONAN, J.   The plaintiff, who had been a depositor in the defendant bank for many years, visited the bank in August, 1929, to make an inquiry as to whether she should hold or sell certain rights which had been issued to her as a stockholder in a public service corporation.   She met the defendant's president, one Fillebrown.   He told her that the bank had a new manager, one Oburg, whose duty it was to deal with securities owned by the customers of the bank and to advise them about investments.   This, he

said, was a service which the bank was offering to its customers and she might as well avail herself of it. He stated that Oburg was honest, reliable and experienced and that the bank "stood behind everything he said or did." The bank, she was told, had reserved a safety deposit box for the securities of customers who had left them to be handled by the bank and that this box could be opened only by Oburg in the presence of two of the officers of the bank. He further said that the certificates that she wished the bank to manage for her should be indorsed in blank; that they would be kept in the safety deposit box and any gains from the sale, purchase or exchange of securities would be credited to her savings account at the bank. He then introduced her to Oburg. Fillebrown repeated what he had told her as to Oburg's position in the bank. After discussing the retention or sale of the rights, she left them with Fillebrown and Oburg. They were sold and her account at the bank was credited with the proceeds. She was so advised in a letter from Oburg upon a letterhead of the Brockton National Company. This letterhead contained the names of the officers of the company and a picture of the defendant bank. She called at the bank within a few days and brought various certificates of stock which Fillebrown told her to indorse in blank; this she did and gave them to him. He gave her a receipt for them. The last time she saw them they were on a desk in Oburg's office. Both Fillebrown and Oburg were there.

The board of directors of the defendant in June, 1927, had appointed a committee to investigate the establishment of a bond department. The records of the board state that "it was the sense of the meeting that a securities department could well be established," and the plan of the Old Colony Corporation seemed most feasible. It was then voted that the committee have definite papers drafted along the lines suggested by the committee for final consideration. The Brockton National Company, hereafter called the company, was organized. One half of the shares were held by the Old Colony Corporation and one half by trustees under a trust agreement whereby stockholders of the

bank could subscribe for as many shares as they held in the bank. Fillebrown was president of the company; one of the vice-presidents of the defendant was a vice-president of the company; another vice-president was the treasurer and clerk of the company. These three officers of the defendant, together with another vice-president of the defendant and a director of the defendant, comprised the board of directors of the company. Oburg was the manager of the company. He was not an official or employee of the defendant. The company occupied space at the bank from August 1, 1927, until December 31, 1932. The space was located next to the tellers' cages. It was separated from the rest of the bank by a marble wall as high as the jury rail, and entrance was through a metal gate. This space was rented from the bank. There were two lighted signs, one read "Brockton National Co." and the other "Investment Securities." There was testimony that the bank prior to 1929 and afterwards was purchasing and selling securities upon order of its customers. The defendant's board of directors voted on October 24, 1932, "to recommend to the directors of the Brockton National Company that they take such action as may be necessary to legally dissolve the Brockton National Company." The company was liquidated on December 30, 1932, and dissolved by St. 1934, c. 187, § 1. Oburg opened an office in another building in his own name in January, 1933, and maintained this office until he was adjudged a bankrupt in 1937.

The plaintiff saw Fillebrown in March, 1934. He told her that on account of a new securities law Oburg could no longer occupy space in the bank but that Oburg was working for the bank in so far as the bank's customers were concerned, and that transactions must take place in Oburg's new office. Fillebrown said that Oburg was honest and trustworthy, and that the bank "stood behind everything he said or did." He told her to go to Oburg's office and exchange her bank receipts for receipts which Oburg would give her in his name to comply with the change in the law; that as far as the bank was concerned she would be covered by the new receipts. He said he would keep

her securities at the bank and deliver them to Oburg. She went to Oburg's office on March 6, 1935, surrendered the bank receipts and got the new receipts. When she did not get a dividend after January 15, 1935, on one of her securities, she saw Oburg in April, 1935, who told her to be patient as he was "moving her stocks around to make more money for her." She did not know how he could do that without selling the stock but she did not then know the stock had been sold. The plaintiff had left her stocks with the idea that the bank would use its discretion in disposing of them and she knew that Oburg was to be the one who would do what was to be done as she understood "he was manager of the department."

Fillebrown died on February 2, 1935. Oburg sold all the plaintiff's stocks in March, 1935, and paid nothing to the plaintiff. She did not learn until after his bankruptcy in 1937 that he had disposed of her securities.

We have now recited many of the salient facts which the jury could find from the evidence. The jury returned a verdict for the plaintiff for $20,000, the ad damnum of the writ, on a count for deceit. The case is here on various exceptions taken by the defendant.

Our first inquiry is whether the defendant is to be held responsible for the statements of Fillebrown. The president of a bank merely by virtue of his office would have no authority to bind the bank by the representations that could have been found to have been made to the plaintiff. *Slattery* v. *North End Savings Bank*, 175 Mass. 380. *Newburyport Institution for Savings* v. *Brookline*, 220 Mass. 300. *Federal National Bank* v. *O'Connell*, 305 Mass. 559. There was no evidence that any express authority to make them was given by the directors, or that he had engaged for such a long time in making representations similar to those made to the plaintiff that the knowledge and acquiescence of the directors could be inferred. *Lonergan* v. *Highland Trust Co.* 287 Mass. 550. *Kelly* v. *Citizens Finance Co. of Lowell, Inc.* 306 Mass. 531. *Hurley* v. *Ornsteen*, 311 Mass. 477.

The defendant, however, was instrumental in the organization of the company, which had adopted a name some-

what similar to that of the defendant, and had permitted the company to occupy space in that part of the premises where the defendant itself conducted its own business. Moreover, the defendant knew that the arrangement and general appearance of that part of its premises occupied by the company were such that they would easily induce those who dealt with the bank to believe that the business conducted in this space was transacted by the bank. One may assume that all business that is conducted in the banking rooms and is of such a nature as that ordinarily and usually conducted by banks is transacted by the bank itself and not by strangers to the bank. *Newman* v. *British & North American Steamship Co.* 113 Mass. 362. *McDonald* v. *Dr. McKnight, Inc.* 248 Mass. 43, 47. *Timmins* v. *F. N. Joslin Co.* 303 Mass. 540. *Barron* v. *McLellan Stores Co.* 310 Mass. 778.

The president of the defendant was in immediate charge of its business and of the activities conducted by the various departments of the bank. But to those of the public who were ignorant of the existence of the company and who reasonably thought that the business conducted in the company's space was conducted by the bank, the president of the bank could have been found to have been clothed with apparent authority in reference to the business transacted in the bank by the company. *Rintamaki* v. *Cunard Steamship Co. Ltd.* 205 Mass. 115. *Denny* v. *Riverbank Court Hotel Co.* 282 Mass. 176. *Lord* v. *Lowell Institution for Savings,* 304 Mass. 212. *Schleifer* v. *Worcester North Savings Institution,* 306 Mass. 226. If the jury came to the conclusion that the president had apparent authority, then the bank is just as much liable for his representations to the plaintiff as if the bank itself had conducted the business that was in fact done by the company. *L'Herbette* v. *Pittsfield National Bank,* 162 Mass. 137. *Chapple* v. *Merchants National Bank,* 284 Mass. 122. *Snow* v. *Merchants National Bank of New Bedford,* 309 Mass. 354. *Oppenheimer* v. *Harriman National Bank & Trust Co.* 301 U. S. 206. And the ostensible authority of Fillebrown was his actual authority to one who was dealing with the bank

through him and who had no notice of any limitations placed upon his authority. *Boston Food Products Co.* v. *Wilson & Co.* 245 Mass. 550. *Forgeron* v. *Corey Hill Garage, Inc.* 249 Mass. 163. *Lonergan* v. *Highland Trust Co.* 287 Mass. 550.

The defendant contends that even if it could be found that Fillebrown made the alleged representations to the plaintiff, it cannot be held liable in damages because it was beyond its corporate power to buy and sell securities for the plaintiff. It is true that by act of February 25, 1927, 44 U. S. Sts. at Large, 1226, and act of June 16, 1933, c. 89, § 16, 48 U. S. Sts. at Large, 184 — see also act of August 23, 1935, c. 614, § 308, 49 U. S. Sts. at Large, 709 — now U. S. C. (1940 ed.) Title 12, § 24, national banks were limited in dealing in investment securities "to purchasing and selling such securities . . . without recourse, solely upon the order, and for the account of, customers, and in no case for its own account." The plaintiff's action is in tort for deceit and not in contract for breach of an agreement with the bank as principal for the purchase or sale of securities. It has been held that the "without recourse" clause does not apply to actions to recover damages sustained by buyers of securities who were induced to purchase by the fraudulent misrepresentations of the president and vice-president of a national bank. *Oppenheimer* v. *Harriman National Bank & Trust Co.* 301 U. S. 206. *Myers* v. *Canton National Bank,* 109 Fed. (2d) 31. Both of these cases set forth the grounds upon which they differ from *Awotin* v. *Atlas Exchange National Bank,* 295 U. S. 209, upon which the defendant here relies. Furthermore, the purpose of said § 24 is to limit a national bank to conducting the business of dealing in securities and stock in any manner other than upon a "without recourse" basis. Even if we assume, but without making any intimation whatever, that the arrangement made between the plaintiff and the defendant was prohibited by any act of Congress, the plaintiff is not precluded from recovery. Ultra vires is not a defence to an action to recover damages against a corporation on account of the fraud of one of its officers acting

within the scope of his authority, even if it was perpetrated in a transaction in which the corporation was not authorized to engage. In *Chapple* v. *Merchants National Bank*, 284 Mass. 122, 143, after stating that a national bank was not authorized to act as a broker or agent in the purchase or sale of securities, the court said that "It is immaterial whether the maintenance of the securities department was ultra vires the bank or not." *Taylor* v. *Boston Water Power Co.* 12 Gray, 415. *Feital* v. *Middlesex Railroad*, 109 Mass. 398. *Nims* v. *Mt. Hermon Boys' School*, 160 Mass. 177. *L'Herbette* v. *Pittsfield National Bank*, 162 Mass. 137. *Nashua & Lowell Railroad* v. *Boston & Lowell Railroad*, 164 Mass. 222. *Hill* v. *Murphy*, 212 Mass. 1. The general rule that ultra vires is not a defence to a national bank when sued in tort to recover damages arising out of fraud has been frequently applied. *National Bank* v. *Graham*, 100 U. S. 699. *First National Bank* v. *Anderson*, 172 U. S. 573. *Nevada Bank* v. *Portland National Bank*, 59 Fed. 338. *Hindman* v. *First National Bank*, 98 Fed. 562. *Greeley National Bank* v. *Wolf*, 4 Fed. (2d) 67. *Clark* v. *Boston-Continental National Bank*, 84 Fed. (2d) 607. See also *Smith* v. *First National Bank*, 268 Fed. 780; *Verrell* v. *First National Bank*, 80 Ore. 550; *Pronger* v. *Old National Bank*, 20 Wash. 618; *Zinc Carbonate Co.* v. *First National Bank*, 103 Wis. 125. Compare *Hannon* v. *Siegel-Cooper Co.* 167 N. Y. 244; *Hedlund* v. *Sutter Medical Service Co.* 51 Cal. App. (2d) 327. There is nothing in the defendant's contention that ultra vires is a good defence in all cases where it appears that a bank derived no benefit from a fraudulent transaction. The principle of respondeat superior applies to banks as well as to other corporations and to individuals. A principal is liable for the fraud committed by his agent or servant acting within the scope of his employment, *White* v. *Sawyer*, 16 Gray, 586; *Haskell* v. *Starbird*, 152 Mass. 117; *Charbonneau* v. *Rokicki*, 278 Mass. 524, and the receipt of a benefit by a defendant is not an essential element in a cause of action for deceit. *Patten* v. *Gurney*, 17 Mass. 182. *Stiles* v. *White*, 11 Met. 356. *Fisher* v. *Mellen*, 103 Mass. 503. *New York Land Improvement Co.* v. *Chapman*,

118 N. Y. 288. Banks have been held liable for the tortious conduct of their officers and agents acting within the scope of their employment in reference to transactions from which the bank received no profits. *Reed* v. *Home Savings Bank,* 130 Mass. 443. *Commonwealth* v. *Reading Savings Bank,* 137 Mass. 431. *Schleifer* v. *Worcester North Savings Institution,* 306 Mass. 226. *Goss* v. *Needham Co-operative Bank,* 312 Mass. 309. It has been expressly decided that the fact that a national bank secured no benefit from the fraudulent act of its agent is immaterial in an action against the bank for deceit. *Nevada Bank* v. *Portland National Bank,* 59 Fed. 338. *Caldwell* v. *First National Bank,* 164 Minn. 401. *Brandenburg* v. *First National Bank,* 48 N. D. 176.

We need not analyze all the representations of Fillebrown. The gist of them was that Oburg was an employee of the bank who was the manager of its investment department. The statements of Fillebrown as to the honesty and integrity of Oburg added little, if anything, to the representations that would naturally arise as to the ability and trustworthiness of one whom the defendant had placed in charge of a department dealing in valuable securities. The plaintiff had the right to rely upon the presumption not only that the defendant would not employ one who was not capable and competent to perform the duties entrusted to him by the defendant, but also that, if he turned out to be incompetent or dishonest, she had a responsible party to look to for reimbursement for her loss. *McDonald* v. *Dr. McKnight, Inc.* 248 Mass. 43, 48. *Barron* v. *McLellan Stores Co.* 310 Mass. 778, 781. *Hannon* v. *Siegel-Cooper Co.* 167 N. Y. 244, 247. The jury could find that the representations of Fillebrown were false and made with the intent that the plaintiff should rely upon them; that she justifiably relied upon them and thereby incurred a loss. The jury could find that all the elements of a cause of action for deceit were proved. There was no error in denying the defendant's motion for a directed verdict.

The case is distinguishable from *Browne* v. *Brockton National Bank,* 305 Mass. 521, in that the facts found by the master in that case are different from those that could have

been found by the jury in the present case. The master found that the plaintiff in the case cited knew or ought to have known that the company and the bank were different corporations, while in the instant case the jury could believe the plaintiff's testimony that she thought she was dealing with the bank alone and never heard of the company until years after her stock was sold by Oburg.

The plaintiff could recover the amount of her loss that was caused by the fraud of the defendant. The misrepresentations of Fillebrown were first made in the summer of 1929, and were repeated in March, 1934. The plaintiff did not suffer any damage while her securities remained in the custody of the bank. She received whatever dividends were paid, and there was nothing to show that if she had presented the receipts issued to her by the bank and demanded her securities they would not have been delivered to her. Although she knew that their market value had diminished for reasons for which the bank was not responsible, she never objected to the bank's holding them. Because of the stock market crash in October, 1929, she preferred to let "things stay as they were" "because we all understand how things were at that time." Her testimony in reference to her intention to let her securities remain as they were is binding upon her. *Germaine* v. *Boston & Albany Railroad*, 298 Mass. 501. *McFaden* v. *Nordblom*, 307 Mass. 574.

Moreover, there is nothing to show that if she had not been induced to turn over the custody of the stock to the bank she would have disposed of it or would have managed it in such a way that she would have acquired more than what the stock was worth in March, 1935, when she took Oburg's receipt for it and allowed him to take charge of the stock. In other words, she did not prove that in March, 1935, she was worse off than she would have been if Fillebrown had not made the representations to her in 1929. *Bradley* v. *Fuller*, 118 Mass. 239. *Freeman* v. *Venner*, 120 Mass. 424. *Lewis* v. *Corbin*, 195 Mass. 520. *Stewart* v. *Joyce*, 205 Mass. 371, 374. *Connelly* v. *Bartlett*, 286 Mass. 311.

The jury could find that she relied upon the advice and statements of Fillebrown in March, 1934, although she did not exchange receipts with Oburg until a year afterwards and when Fillebrown was dead. If, instead of dealing with Oburg, she had demanded and received her shares from the bank, then on this record she could not have recovered any damages from the bank. On the other hand, if she followed the directions of Fillebrown, as it could be found she did, and surrendered the bank receipts for those given her by Oburg, then she did not finally part with her property until this was done. The sale of the stock by Oburg and the misappropriation by him of the proceeds could be found to be the direct and proximate result of the fraudulent misrepresentations made by Fillebrown in 1934, and the measure of her damages was the market value of her property on March 6, 1935, when she entrusted it to Oburg. *Grant v. Mellen,* 134 Mass. 335. *Nash v. Minnesota Title Ins. & Trust Co.* 163 Mass. 574. *Coffing v. Dodge,* 167 Mass. 231. *Fitzgerald v. Guaranty Security Corp.* 239 Mass. 174. *Hashem v. Massachusetts Security Corp.* 255 Mass. 29. See *Seideman v. Sheboygan Loan & Trust Co.* 198 Wis. 97. While the plaintiff was not entitled as matter of right to interest on the damages, yet the jury could in their discretion increase the damages by the addition of interest. *Jones v. Wolcott,* 2 Allen, 247. *Stewart v. Joyce,* 205 Mass. 371. *International Trust Co. v. Myers,* 241 Mass. 509, reversed on other grounds, *Myers v. International Trust Co.* 263 U. S. 64. *H. D. Foss & Co. Inc. v. Whidden,* 254 Mass. 146. *Connelly v. Fellsway Motor Mart, Inc.* 270 Mass. 386. *Young v. New York, New Haven & Hartford Railroad,* 273 Mass. 567. *Potier v. A. W. Perry, Inc.* 286 Mass. 602. *Dow v. Brookline Trust Co.* 308 Mass. 90.

There was error in the denial of the defendant's forty-third request, to the effect that damages could not be based upon the market value of the plaintiff's securities in August, 1929, and in giving instructions that permitted the jury to assess damages computed as of that time. The purchase slip of the Kingman stock and the two written receipts for the Gay and Keith stocks by the bank, unaccom-

panied by any evidence as to the transactions to which they referred, ought not to have been introduced in evidence, but their admission, in view of other testimony that the defendant purchased and sold securities in accordance with the orders from its customers, did not constitute reversible error. *Kurland* v. *Massachusetts Amusement Corp.* 307 Mass. 131. There is nothing in the exceptions to the argument of the plaintiff's counsel. The judge thought one statement was objectionable and said he would take care of it in the charge, which we think he did by referring to the plaintiff's claims and stating that the bank and the company were different corporations and that the company "was a distinct corporation and in no way a part or department of the bank." An examination of the other exceptions does not disclose that any of the rights of the defendant were prejudiced. No further discussion of them is required.

The defendant's exceptions must be sustained, but the new trial is to be had only on the question of damages, which are to be determined in accordance with this opinion.

*So ordered.*