CAROL A. FRASER *vs.* STEWART A. FRASER & another.

Essex.   October 7, 1955. — March 29, 1956.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Marriage,* Validity, Foreign marriage.  *Evidence,* Presumptions and burden of proof.

A woman was bound by her testimony showing knowledge on her part that a man with whom she went through a marriage ceremony in another State was at the time incapable of marrying her in Massachusetts. [6]

The fact that a woman, who went with a man from Massachusetts to another State and there married him less than six months after he obtained a decree nisi of divorce here and immediately returned here with him and lived with him here until long after the divorce decree had become absolute, knew at the time of the marriage that he could not marry her here during such six months required the conclusion that she joined with him in going to the other State to evade the laws of Massachusetts contrary to G. L. (Ter. Ed.) c. 207, § 10, and precluded the conclusion that she acted "in good faith" within § 6 and the conclusion that under § 6 they became "legally married from and after the removal of . . . [the] impediment" when the divorce decree became absolute, even though at the time of the marriage she believed that he had been divorced and was free to marry her in the other State and that it was "all right" to go there to get married with the purpose of returning to live together here.  [7–8] COUNIHAN, J., dissenting.

PETITION, filed in the Probate Court for the county of Essex on March 22, 1954.

The case was heard by *Costello,* J.

In this court the case was submitted on briefs.

*Arnold H. Salisbury,* for the petitioner.

*Maxwell H. Robinson,* for the respondent Mary Jane Bigbee.

RONAN, J. This is a petition brought in the Probate Court under G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1, against the male respondent with whom the petitioner had gone through a ceremony of marriage, and also against the female respondent who had also gone through a marriage ceremony with him, to determine the marital status of the petitioner. See *Hogan* v. *Hogan,* 320 Mass. 658. The petitioner appealed from a final decree declaring that the male respondent and herself are not husband and wife. The parties have designated the evidence that they desired reported, and the judge has made findings of material facts.

The male respondent married one Germaine Verrette at Andover in this Commonwealth in 1947, and obtained a decree nisi from her in the Probate Court for Essex County on November 2, 1950. That decree became absolute on May 3, 1951. Fraser and Mary Jane Bigbee, both residents of this Commonwealth, went to Salem, New Hampshire, on December 1, 1950, and were married there. They returned to this Commonwealth on the same day and lived here together until Fraser left her in January, 1954. A child was born on April 9, 1951. The petitioner met Fraser while he was living with his second wife, learned the circumstances connected with his marriage with that wife, and married him on May 11, 1954, at Barnstable. The judge found that Mary Jane believed that Fraser had been divorced and was free to marry her in New Hampshire on December 1, 1950, that they lived together as husband and wife, in good faith on her part, until January, 1954, when he left her, and that the marriage of the petitioner and Fraser was invalid.

Mary Jane testified that before their marriage Fraser had told her that he expected his divorce case would come up in the fall of 1950, and that as soon as he had secured it "we were going to be married in New Hampshire, because he said we couldn't get married in Massachusetts, but it was

all right to get married in New Hampshire"; that he told her that he would have to wait a six months' period in Massachusetts "but he said it was all right to go to New Hampshire, and I went up there in good faith"; that she knew at that time that she could not marry him here but she thought she could marry there and they could then return to this State and live together; and that she believed what Fraser had told her as his reason for their going to New Hampshire to be married.

It is a well settled rule of evidence that a party is bound by his testimony concerning his knowledge, motives, beliefs, purposes, feelings, and other similar subject matters of which he alone may be presumed to have personal information and concerning which he might be thought to speak with reasonable assurance of the truth. Testimony upon such subjects has properly been held to bind the party who gives it. He has no right to ask a judge or a jury to disregard it. Mary Jane in the face of this testimony must be held to have known that Fraser was incapable of entering into a marriage with her in this Commonwealth before the decree nisi had become a decree absolute. *Laffey* v. *Mullen,* 275 Mass. 277. *Butler* v. *Graves,* 284 Mass. 84, 85. *Germaine* v. *Boston & Albany Railroad,* 298 Mass. 501. *Ramseyer* v. *Conlon,* 303 Mass. 270. *Beebe* v. *Randall,* 304 Mass. 207, 210–211. *McFaden* v. *Nordblom,* 307 Mass. 574, 575. *McCarthy* v. *Brockton National Bank,* 314 Mass. 318, 327. *Meunier's Case,* 319 Mass. 421, 424. *Dubois* v. *Atlantic Corp.* 322 Mass. 512, 522.

Notwithstanding her unequivocal testimony, Mary Jane contends that her marriage was valid within G. L. (Ter. Ed.) c. 207, § 6.[1] She relies principally upon *Vital* v. *Vital,*

---

[1] "If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief that the former husband or wife was dead, that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed . . . if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment . . . ."

319 Mass. 185. That case is plainly distinguishable from the instant case. It did not appear in the record that the wife in that case knew that she could not be married in this Commonwealth. In the case at bar Mary Jane knew when she married Fraser in New Hampshire on December 1, 1950, that he could not marry her in this Commonwealth before May 3, 1951. G. L. (Ter. Ed.) c. 208, § 21, as amended by St. 1934, c. 181, § 1. It was to evade that provision that she was married in New Hampshire. On this record no other explanation is possible.

At the time of their marriage both parties were domiciled here, and both knowing they could not marry in this Commonwealth intended to go through a marriage ceremony in New Hampshire and to return here to live as husband and wife. This was contrary to the provisions of G. L. (Ter. Ed.) c. 207, § 10.[1] *Chapman* v. *Chapman*, 224 Mass. 427. *Murphy* v. *Murphy*, 249 Mass. 552. *Payzant* v. *Payzant*, 269 Mass. 70, 72. *Atwood* v. *Atwood*, 297 Mass. 229. *Levanosky* v. *Levanosky*, 311 Mass. 638. *Belcher* v. *Belcher*, 324 Mass. 757. *Korostynski* v. *Korostynski*, 328 Mass. 6.

We do not agree that G. L. (Ter. Ed.) c. 207, § 6, applies where, as here, one of the parties learns from the other that the latter is prohibited from marrying here within six months of the time he has been granted a divorce and that in order to circumvent our laws it is necessary to have the ceremony performed in another State.

An attempt by residents of this Commonwealth to avoid her laws through the expedient of a marriage ceremony in another State is not the "good faith" to which special consideration is extended by that section. *Gardner* v. *Gardner*, 232 Mass. 253, 258. In that case the parties had gone to New York to be married, and it was said by this court at page 257, "If they went to New York, both knowing of the

---

[1] "If any person residing and intending to continue to reside in this commonwealth is disabled or prohibited from contracting marriage under the laws of this commonwealth and goes into another jurisdiction and there contracts a marriage prohibited and declared void by the laws of this commonwealth, such marriage shall be null and void for all purposes in this commonwealth with the same effect as though such prohibited marriage had been entered into in this commonwealth."

impediment to their marriage in this Commonwealth and with a purpose to avoid the force of the laws of this Commonwealth and to return here to live, then that marriage would be void here." That statement is precisely applicable to the present case.

A few words will serve to make plain the difference between the case last cited and the present case. One Rosella Gardner obtained a divorce from her husband Horace on January 16, 1901, but in November, 1900, he under an assumed name went through a marriage ceremony in New York with one Sadie, then a young school girl eighteen years of age. She learned of Horace's real name in April, 1901, and separated from him. Later she joined Horace in this Commonwealth and then learned of his real marital situation. He took her to New York where they were remarried on July 15, 1901, one day before Rosella's divorce had become absolute. The trial judge found that "She [Sadie] knew that she could not be remarried in Massachusetts without a license, and that a license could not be obtained without her parents' consent, because she was still under age." As the statutes then stood it was § 10 of R. L. c. 151 which made a marriage in the foreign State void here only if it was to evade any of *the first five sections* of that chapter  Those sections pertained to real impediments to a marriage. They contained no mention of a license. It is with that thought in mind that the court stated at page 257, "The pivotal question is whether, in entering into the marriage of July, 1901, both parties, being resident in this Commonwealth and intending to return here to live, went to New York to have their marriage solemnized with an intent to evade any of the provisions of *the first five sections* of R. L. c. 151, contrary to § 10 of that chapter" (emphasis supplied). There was in fact a real impediment, that is, the marriage of Horace before the decree granting a divorce to Rosella from him became final but Sadie knew nothing about that fact. In brief the distinction between the *Gardner* case and this case is that, since in that case the woman lacked the consent of her

parents, she could not obtain a license authorizing any-one to perform in this Commonwealth a marriage between Horace and herself while in the instant case Mary Jane knew at the time she married Stewart there could not be any valid marriage between them in this Commonwealth.

Mary Jane knew of his impediment and she joined with him in evading the statute. Even if she honestly took Fraser's advice and joined with him in a marriage ceremony which she knew could not be performed here, such a marriage was violative of the provisions of G. L. (Ter. Ed.) c. 207, § 10.

The final decree should be reversed and a decree entered that the male respondent and the petitioner are husband and wife.

*So ordered.*

COUNIHAN, J. I regret that I am unable to concur in the opinion of the court in this case.

The issue to be determined depends upon the construction of G. L. (Ter. Ed.) c. 207, § 6 and § 10, both of which are set out in footnotes to the opinion.

I am in accord with the facts as set forth in the opinion but I differ in the inference which the court draws from such facts. I think it should be emphasized that, although Fraser told Mary Jane that they could not be married in Massachusetts, he also told her that it was all right to be married in New Hampshire. In her testimony Mary Jane insisted several times that she honestly thought that it was all right and legal to be married in New Hampshire.

The probate judge found as a fact that "Mary Jane acted in the full belief that the respondent Fraser had been divorced and was free to marry her in New Hampshire on December 1, 1950," and that "after the marriage they lived together in Massachusetts as husband and wife, in good faith on her part, until January, 1954, when the respondent Fraser left her," a period extending far beyond the time when the impediment to their marriage was removed.

The familiar rule should be applied that we do not reverse

the findings of facts of the judge in these circumstances, unless they are plainly wrong. There was ample evidence to warrant his findings. The opinion in effect holds that the evidence does not support the findings as matter of law. This conclusion is apparently reached on the ground that because Mary Jane knew that she could not be married in Massachusetts it must necessarily be inferred that she purposely went to New Hampshire to be married there to evade the laws of our Commonwealth. I am unable to put this construction upon her conduct for it nowhere appears in the evidence that she had any such intention and I do not believe such an inference is permissible from the evidence. She may have gone into New Hampshire to *avoid* the law of our Commonwealth but there is no evidence that she went there to *evade* our law.

I am of opinion that *Vital* v. *Vital,* 319 Mass. 185, 193, 196, establishes the proposition that § 6 overrides § 10 in the present circumstances. It is clear from a reading of § 6 that if a person, in good faith, in the full belief that a former marriage of another has been annulled by divorce, marries the other, they shall be validly married after any impediment to such marriage has been removed, if they continue thereafter to live together as husband and wife in good faith on the part of one of them, and the issue of such marriage shall be considered the legitimate issue of both parents. Moreover, nowhere in § 6 does it appear that its remedial provisions are limited by any of the provisions of § 10. I do not believe that the restrictive provision of § 10 should be read into § 6 unless the evidence clearly shows that it was one of the reasons for entering into the marriage. See G. L. (Ter. Ed.) c. 207, § 4.[1]

The effect of § 6 has been considered by this court many times and it has generally been held that only good faith, full belief that the former marriage was annulled by divorce, and a living together in good faith after the removal of any

---

[1] General Laws (Ter. Ed.) c. 207, § 4, reads: "A marriage contracted while either party thereto has a former wife or husband living, *except as provided in section six* . . ., shall be void" (emphasis supplied).

impediment, are required to validate the second marriage. .
*Lufkin* v. *Lufkin,* 182 Mass. 476, 477–480. *Turner* v.
*Turner,* 189 Mass. 373, 375–376. *Gardner* v. *Gardner,* 232
Mass. 253, 257–258. *Hopkins* v. *Hopkins,* 287 Mass. 542,
548. *Vital* v. *Vital,* 319 Mass. 185, 193, 196. *Royal* v.
*Royal,* 322 Mass. 662, 663. *Royal* v. *Royal,* 324 Mass. 613,
615–616. See *Atwood* v. *Atwood,* 297 Mass. 229; *Carmichael*
v. *Carmichael,* 324 Mass. 118, 121.

In the *Turner* case at page 375 it was said, "While one of
the objects of the statute [R. L. c. 151, § 6, a predecessor of
G. L. (Ter. Ed.) c. 207, § 6] is to protect persons who enter
into the marriage relation in good faith, the broad general
purpose of the statute is to provide against illegitimacy of
children and to protect the public interests. Its purpose is
to provide that the marriage ceremony, illegal at first by
reason of the existence of an impediment, shall be regarded
as taking place at the time the impediment is removed and
as covering all marital relations thereafter assumed in good
faith." And at page 376 it was said, "And such a relation
thus once sanctioned in the law, legitimatizes the children
and leads to the protection of the moral welfare of the
community."

In the *Gardner* case it appeared that the wife of the
second marriage went out of this Commonwealth to evade
R. L. c. 151, § 7, a predecessor of G. L. (Ter. Ed.) c. 207,
§ 7, which required the consent of parents of a girl under
eighteen to marry. The wife in that case went from this
Commonwealth to New York where such consent was not
required. At page 258 it was said by Chief Justice Rugg,
"The good faith of a party to such a marriage ceremony is
a fact. In reaching a conclusion, the point to be ascer-
tained is whether there is actual honesty of purpose. The
words 'good faith' in R. L. c. 151, § 6 [a predecessor of
G. L. (Ter. Ed.) c. 207, § 6], have no technical or refined
meaning but are used in their ordinary signification. They
do not require insight into circumstances calculated to
arouse suspicion or to put sagacious persons on inquiry.
They do not denote the standard of knowledge of the per-

son of ordinary prudence. A stupid person, who is free from any culpable design and acting with genuine integrity, may enter into a marriage in good faith, when a more worldly wise person of greater intelligence could not fail to be conscious of some degree of moral delinquency. The circumstances in the case at bar might well have put a shrewd woman on her guard. But they are not so clear as to require the conclusion that the respondent did not act in good faith. *Lufkin* v. *Lufkin*, 182 Mass. 476. *Minot* v. *Burroughs*, 223 Mass. 595, 604. The respondent's ignorance of the law and action upon that ignorance, while it would not protect her from the consequences if that were the only matter involved, does not make imperative a finding that she did not at the same time conduct herself with good faith. The purpose of the statute is to provide against illegitimacy of offspring and to protect the public interests. It is designed in part to avert the stigma of illegitimacy from innocent children when one parent is blameless of any conscious transgression of the laws regulating marriage. *Turner* v. *Turner*, 189 Mass. 373. *Green* v. *Kelley*, 228 Mass. 602. The determination of the question, whether the respondent went from North Adams to Hoosac Falls to be married and returned to live in North Adams in good faith without any purpose to circumvent our marriage laws and honestly thinking that she might do so legally, well might have depended in large degree upon her appearance and manner of testifying. The decision of the judge of the Land Court in her favor on this point cannot be pronounced erroneous in law."

The opinion in no way distinguishes any of the cases above referred to. I agree with the law as expressed in the cases like *Ewald* v. *Ewald*, 219 Mass. 111, but the results in those cases are all predicated upon the principle that one who knowingly enters into a marriage with purposeful intent to evade the laws of our Commonwealth is guilty of bad faith and cannot avail himself of § 6. In the circumstances of those cases the party seeking relief was bound by the familiar equity rule that such a party must come

into court with clean hands. In the instant case no such rule is involved.

I believe that the cases cited in the opinion to support the principle that c. 207, § 10, alone should be relied upon, do not as matter of law justify such a conclusion. All of those cases may be distinguished for one reason or another. In several relief was denied because the petitioner did not come into court with clean hands. *Ewald* v. *Ewald*, 219 Mass. 111. In others c. 207, § 6, was not even considered nor discussed. In another there were no findings of facts such as we have in the case at bar. *Atwood* v. *Atwood*, 297 Mass. 229, appears to support my views rather than those expressed in the opinion.

The result of the opinion is contrary to the oft expressed statement that the purpose of § 6 is to provide against illegitimacy and to protect the public interest.

I am of opinion that full weight and credit should be given to the findings of the judge of the Probate Court as to the good faith of one of the parties who enters into a marriage prohibited by § 10. Otherwise § 6 is of little or no effect.

Finally I am of opinion that Carol was fully aware of all the circumstances of Mary Jane's marriage when she married Fraser. It is plain that she and Fraser discussed the situation on many occasions and both sought the advice of a lawyer. It is fair to infer that they were advised that if Fraser brought proceedings to annul the marriage to Mary Jane he could not prevail. *Ewald* v. *Ewald*, 219 Mass. 111. *Korostynski* v. *Korostynski*, 328 Mass. 6. The result was the marriage of Carol and Fraser so that she could institute these proceedings. I do not think that what Fraser could not do directly Carol should be permitted to do indirectly, particularly when the status of the acknowledged son of Mary Jane and Fraser is involved and his future may be seriously affected.

I think the decree of the probate judge should be affirmed.