HARRY. W. SMITH vs. THOMAS G. PLANT.

Worcester.   March 12, 1913.— October 31, 1913.

Present: RUGG, C. J., HAMMOND, LORING, SHELDON, & DE COURCY, JJ.

*Agency*, Commission of agent.  *Contract*, Performance and breach.  *Practice,
Civil*, Conduct of trial.  *Witness*, Corroboration.  *Evidence*, In corroboration
of witness, Contents of document.  *Words*, "Introduction," "Introduce."

In an action to recover a commission on a sale by the defendant to a certain
shoe machinery corporation of certain shoe machinery patents and shares in
a shoe manufacturing corporation, where the jury are warranted in finding
that the defendant offered to pay the plaintiff a five per cent commission
for procuring interviews between the defendant and certain officers of the
purchasing corporation in which it should be understood that the interviews
were sought by such officers for the purpose of purchasing the defendant's
patents and shares of stock, in case such interviews conducted by the de-
fendant in his own behalf should result in a sale of the property, evidence,
that, after such interviews thus procured had taken place but before the sale
was effected, the defendant wrote to the plaintiff that he might " give the
matter no further attention," does not affect the plaintiff's right to recover,
because when the letter was written the services for which the plaintiff was
to be paid already had been performed.

It is proper for a presiding judge to instruct a jury as to the meaning of words
in the pleadings, and, where the judge and the counsel concurred in assuming
that a certain word explained by the judge was in the declaration when it was
not, this erroneous assumption affords no ground for an exception, if the allega-
tions in the declaration were in substance what the judge told the jury that
they were.

In an action to recover a commission on a sale by the defendant to a certain shoe
machinery corporation of certain shoe machinery patents and shares in a shoe
manufacturing corporation, where there was evidence that the service to be
performed by the plaintiff was to procure interviews between the defendant
and certain officers of the purchasing corporation in which it should be under-
stood that the interviews were sought by such officers for the purpose of pur-
chasing the defendant's patents and shares of stock, the defendant excepted
to the use of the word "introduced" in the judge's charge.   In using the
word "introduced" in his charge the judge explained to the jury that he used
it only as a "short cut" and left it to the jury to say what the plaintiff was to
do and whether he did it.   *Held*, that the defendant's exception must be
overruled.

Except where moral duress or a concealment of facts has been shown, evidence
of previous statements of a witness, whose credibility has been attacked, con-
sistent with his present testimony is not admissible in this Commonwealth;

and *a fortiori* is such corroborating testimony inadmissible where no con-
tradictory statements of the witness have been put in evidence.

Where a plaintiff cross-examines the defendant, in regard to a statement in
writing made by the defendant narrating certain negotiations, by asking him
to give the order in which certain events are recorded in that statement, for
the purpose of laying the foundation of an argument that the events occurred
in the order in which they are mentioned in the writing, this is more than ask-
ing the witness to refresh his recollection by the memorandum and amounts
to asking for the contents of a document without putting in evidence the
writing itself, and on objection such an inquiry should be excluded; but in
the present case the admission of the oral evidence as to the contents of the
paper was held to have done the defendant no harm, because an inspection of
the statement in writing showed that the order of the events inquired about
as noted therein accorded with the secondary evidence of the contents of the
paper given in the defendant's testimony.

Where a party to an action has cross-examined the adverse party as to a part of
the contents of a statement in writing made by such adverse party, if the
statement in writing is a long one relating to various matters, the adverse
party, although entitled to put in evidence the part of the document to which
the questions referred, is not entitled to put the whole statement in evidence.

LORING, J. This action was brought to recover a five per cent
commission on the price received by the defendant from the
United Shoe Machinery Company for a sale to it of his patents
and shares in the capital stock of the Thomas G. Plant Company.

Certain facts were not in dispute. Before the matters here in
suit took place there were no business relations between the
plaintiff and the defendant. Their acquaintance grew out of their
exhibiting horses at fairs and horse shows. It seems to have
been common knowledge that the defendant was an antagonist
as well as a competitor of the United Shoe Machinery Company.
The plaintiff, who had been educated in mechanics and in schools
of design, testified that he had been engaged in the manufacture
of fabrics, had made inventions for which patents had been
issued, had been retained as a patent expert and had been in-
strumental in bringing about a consolidation of competing manu-
facturers. He further testified that in 1908, six years after their
acquaintance began, he and the defendant had a talk at the
Brockton Fair, where the plaintiff had been a judge and the
defendant's horses were competing. The defendant asked the
plaintiff what he was doing, and after telling him what he was
doing the plaintiff said that he knew what he, the defendant,
was doing, and volunteered the advice that it was better "to
get in" with the trusts than to "make faces" at them, and

that if he, the defendant, had what he, the plaintiff, believed he had, he was "going to be useful to the Shoe Machinery." To this the defendant said that he had his own plans. There were a few letters of no importance in 1909. Beginning at the end of May, 1910, and ending June 10, 1910, the plaintiff wrote to the defendant giving him unsolicited advice as to how to deal with the Shoe Machinery Company and its officers. In a letter of June 9, the plaintiff wrote to the defendant that if any one was working as he wanted to work in this matter he would like to know it, and if the defendant wrote him "I know the Shoe Machinery managers so well that I feel your efforts would be in vain," he would stop. To this he received no answer. On the evening of July 21, the defendant, then at the Belmont Hotel in New York City, telephoned to the plaintiff, then at his home in North Grafton, Massachusetts, to come to New York by the night train. The plaintiff did so, arriving at about 6.30 the next morning. So far the facts seem not to be in dispute. Further it was not in dispute that a good many years before 1910 the defendant had received from the United Shoe Machinery Company what he considered unfair treatment. In consequence of that treatment he had stripped his factory of all machines of that company, had invented and patented machines to compete with it, and had organized a corporation named the Thomas G. Plant Company, which was successfully manufacturing shoes under the defendant's "Wonder Worker" machinery. The defendant owned sixty per cent of the capital stock of the Plant Company. About the middle of June, 1910, the defendant had tried to sell his shoe patents to the Shoe Machinery Company through one Endicott, who was a manufacturer. While these negotiations were going on, Endicott became a director of the Shoe Machinery Company and the negotiations came to an end about July 7. · The final meeting was held at the Algonquin Club in Boston, at which Mr. Winslow, the president, and Mr. Herrick, the counsel of the Shoe Machinery Company, among others were present. These two men the defendant subsequently told the plaintiff were at that time strongly opposed to the proposed trade between the defendant and the Shoe Machinery Company. In addition the plaintiff testified that the defendant had told him before he was summoned to New York on the evening of July 21, that he had had

"the pleasure of telling him [Winslow] what I thought of him."

The plaintiff had called on one Barbour, vice-president of the Shoe Machinery Company, of his own motion, and had told him of the great value of the defendant's patents and had been told by Barbour that Winslow in Boston was the man to see. The plaintiff testified that when he told the defendant this on July 15, the defendant had answered that he had his own plans. In this conversation the plaintiff had told the defendant that "the New York end is the proper end to work at."

On arriving in New York on the morning of July 22, the plaintiff — so he testified — went to the defendant's room in the Belmont and woke him up. He testified that the defendant then said to him (the plaintiff) that he had sent for him because he thought that his "plan of the New York end is the right plan." After some further conversation the defendant said (so the plaintiff testified): "If you can get Barbour to send for me so when I come into the office he will say, 'Plant, I asked Mr. Smith to bring you here,' I believe that I can so put matters before him with that opportunity that you make that the negotiations will go along and that I can bring Barbour over to our side. Barbour was strongly against the purchase of the patents, etc., at the Algonquin Club meeting." And also that he (the defendant) asked him (the plaintiff) if he could "go and get Herrick, whom I never have met, so I can talk with him and show him the great value of getting the Thomas G. Plant shoe factory of which I now own sixty per cent of the stock bringing in six hundred or seven hundred thousand dollars a year which would carry the shoe patents." The plaintiff testified that he then asked him his price and that the defendant answered: "Smith, the question of price is my own. What I want to do is to get in so I can talk with Barbour and get in so I can talk with Herrick, I don't want you even to mention a money price. . . . You keep your hands off the price, you get these men where I can show them the value of what I have got and I will close these negotiations myself."

The plaintiff then testified that he saw Barbour and arranged a meeting for that afternoon, and that at that time he went to Barbour's office with the defendant and introduced the defendant. "This is Mr. Plant. . . . As I understand, you sent for Mr.

Plant;" thereupon they talked for some six hours; toward the end "their manner was friendly and agreeable;" and the interview ended with an appointment for the next morning. The plaintiff and the defendant dined and spent the evening together at the Belmont Hotel. At that time the defendant congratulated the plaintiff on what he had accomplished, and said: "You have done exactly as I wanted you should do with Barbour and now I want you to line up Bob Herrick."

The plaintiff further testified that during dinner the defendant said to him: "In regard to this five per cent that you talk about once in a while that you have made on your other deals; there is no five per cent for you in this." That he (the plaintiff) told the defendant that he was going to get five per cent or "I do not do any more work in the matter." That on the following morning the first thing the plaintiff said was: "How about that five per cent?" That the defendant said, "I am not going to pay it." To which the plaintiff answered: "I am through, I shall simply tell Barbour that you are impossible." That after breakfast they took a cab and on the way to Barbour's office the defendant said he would pay him the five per cent, but proposed to get some of it from the Shoe Machinery Company; and for that purpose he proposed to the plaintiff that during the coming interview he should turn to Barbour and say, "Where does Smith come in?" and that he (the plaintiff) should say, "At the end, anything that is fair;" that then he (the defendant) would say to Barbour, " 'We will take care of Smith,' and Mr. Barbour will say ' yes ' and then we have got him." To which he replied: "All right, Mr. Plant, but remember I will look to you for the five per cent. You can get what you want out of the Shoe Machinery." The plaintiff testified that during the interview with Barbour this conversation took place as planned. The result of the interview on Saturday, July 23, between Barbour and the defendant was that Barbour promised to go to Boston the next day and take up the matter with Winslow.

The plaintiff further testified to a number of visits to Herrick and Winslow, and that he finally arranged for a meeting between the defendant and Herrick at the Touraine on Tuesday, August 2; that he engaged a room for them, and as Herrick entered he said: "Mr. Robert Herrick, this is Mr. Thomas G. Plant," and then

left them together as the defendant had requested him to do. The plaintiff also testified that on August 15 he saw Winslow and that after a long conversation Winslow told him (the plaintiff) to tell the defendant that he, the defendant, had broken off the negotiations and that "We are ready to take them up again;" that he told the defendant that, and he (the defendant) answered that he was "sick and tired of this Shoe Machinery crowd," and that he did "not propose to have anything more to do with them."

There was evidence that the defendant sold his machines, patents and stock in the Thomas G. Plant Company on September 22 and 23, and carried the sale through on September 30, and that the price was $6,000,000. On September 24 the plaintiff wrote to the defendant his congratulations and proposed to "run off" his work from July 30 to date, to enable him to mail a copy to Barbour, "so that when the time is ripe, we can take up with him the question of settlement for H. W. S., as we talked over in his office, the afternoon of July 22nd." To this the defendant answered on September 27 that he (the plaintiff) had accomplished nothing but a few interviews with Herrick which amounted to nothing, and that "is where the whole affair ended with Harry W. Smith." After an interchange of a few more letters this action was brought. The plaintiff had a verdict * and the case is here on exceptions taken by the defendant.

The declaration contained two counts. After an introductory statement the material allegations of the first count were in these words: "July, 1910, the defendant informed the plaintiff that he was wholly unable to successfully negotiate a sale of his property aforesaid to the United Shoe Machinery Company or its allied interests, and did not know and was unable to meet upon a satisfactory footing the persons connected with said Machinery Company who were influential in determining its action with reference to purchasing the defendant's property, and sought the plaintiff's assistance to that end, and on or about July 21, 1910, the defendant promised and agreed with the plaintiff that if the plaintiff would bring about meetings between the defendant and certain persons who were officers and stockholders in and advisers of said Machinery Company at which or in consequence of

* In the sum of $323,750.

which the defendant was enabled to sell his property, he would pay the plaintiff five per cent of any sums or the value of any property which he received in such sale." In the second count there was no allegation that the plaintiff's right to a commission was to depend upon a sale being made in consequence of the meetings brought about by him. In place of that allegation (found in the first count) there was substituted after the allegation that the plaintiff was to bring about meetings between the defendant and certain persons who were officers and stockholders in and advisers of said Machinery Company these words: "viz.: William Barbour and Robert F. Herrick, and that thereafter the defendant was enabled to sell his property to said company, he would pay the plaintiff five per cent," etc.

1. The first exception argued by the defendant is one taken to the judge's refusal to instruct the jury that "the plaintiff cannot recover on the first count of his declaration. There is no evidence that the contract alleged therein was made."

In support of this exception the defendant has contended first that the evidence did not warrant a finding that "anything done by the plaintiff under any contract with the defendant was the cause of the sale." If the jury believed the plaintiff's testimony they were warranted in finding that the negotiations between the defendant and the officers of the Shoe Machinery Company in June had been broken off in such a way that it was not possible for the defendant to hope to make a sale to the Shoe Machinery Company if he undertook to reopen them; that what the defendant wanted from the plaintiff was to get Barbour to send for him (the defendant) in such a way that he (the defendant) could assume that the negotiations had been reopened by Barbour, and that the plaintiff was to arrange a similar meeting between Herrick and the defendant; that the plaintiff succeeded in arranging for such meetings with both, and that the sale finally made was brought about through the plaintiff's success in bringing about these meetings.

The second contention made by the defendant in support of this ruling is that the plaintiff's employment was terminated by a letter from the defendant to the plaintiff dated August 10, 1910, in which the defendant wrote: "I am writing this to you that you may give the matter no further attention." In this

connection the defendant relies on the rule (established in *Cadigan* v. *Crabtree,* 186 Mass. 7, and *Smith* v. *Kimball,* 193 Mass. 582,) that in the ordinary case where a broker is employed to find a customer or make a sale the principal acting in good faith can discharge the broker at any time before the broker procures the customer or makes the sale. But the case at bar was not the ordinary case of a broker being employed to find a customer or make a sale. The customer to whom the defendant wanted to make a sale was known to the defendant (the principal). The defendant's difficulty was (or it could have been found by the jury to have been) that he had broken off earlier negotiations in such a way that from a business point of view it was not possible for him to undertake to reopen them, and that under these circumstances he had employed the plaintiff to reopen them by bringing about meetings between him and the Shoe Machinery people, after which he was to carry on the negotiations and the plaintiff was to do nothing. Under these circumstances it was of no importance that the defendant told the plaintiff "to give the matter no further attention" after he had brought about the desired meetings and had done all that he was employed to do.

The defendant's third contention in support of this request for a ruling is that if any contract between the plaintiff and the defendant was found by the jury, it was as matter of law that alleged in the second count, not that alleged in the first count. That is to say, that if the jury found that a contract was made it was a contract to pay the plaintiff the five per cent commission if a sale was afterwards made by the defendant without regard to the sale having been made "in consequence of" the meetings between the defendant and the officers of the Shoe Machinery Company brought about by the plaintiff. The defendant relies in support of this contention on the fact that in his testimony the plaintiff did not state that as one of the conditions on which his right to a commission was to depend; and further, that the plaintiff on being asked on cross-examination, "Was it made any condition or part of the bargain that the sale should be the result of your plan or scheme or your efforts?" said, "No, sir." But although the plaintiff stated that his right to a commission was not made dependent on the sale being the result of his efforts, it might be implied from the nature of the plaintiff's employ-

ment that that was one of the conditions on which his right to a commission was to depend.

2. The second exception argued by the defendant was taken by his counsel in these words: "I desire to except to your honor's ruling defining the word 'introduction' as used in the declaration. I say there is no authority for holding that that term means anything else than its natural meaning, and that it does not mean bringing Barbour and Herrick into a proper frame of mind, and cannot so be considered." It was also stated in the bill of exceptions that "The defendant, after the charge, excepted to the definition of the word 'introduced' as given in the charge."

The presiding judge * began his charge by pointing out that the case at bar was not like the ordinary case of an action by a broker to recover a "real estate commission;" that in that case the broker is to hunt around and find a customer, and when he undertakes to effect a sale to his principal, or to whomever is to be introduced by him as a possible customer with whom the principal is to negotiate, the broker earns a commission if a sale is made. He then went on to speak of the "plaintiff's position here" in these words, omitting what is not material: "It was not the case of making a sale to him, to somebody; it was not the case of introducing to him a customer and let him make the sale. His claim is what he sets out in his declaration. . . . And there are two counts in the declaration. They are both alike in this that the plaintiff says that the defendant wanted to sell his property, the Plant property, patents, manufactory, etc., wanted to sell it to the United Shoe Machinery Company, and that in order to sell it to that corporation there were a number of people who must be gotten into the proper frame of mind. Precisely as the ordinary purchaser of a piece of real estate has to be gotten into a proper frame of mind. That is what the plaintiff undertook to do, where he says what he was hired to do. . . . That is what he says he was hired for, hired to do. The phrase has been used, 'introduced Mr. Plant to Mr. Barbour and to Mr. Herrick.' Now he has emphasized, called your attention to the fact, that the word 'introduce' is merely a convenient sort of word. Of course

---

* *Lawton*, J.

'introduction' such as is spoken of at some times is not what he means. It is, of course, perfectly plain that Mr. Plant could have gone to either of these people without introduction or with a letter of introduction from a mutual friend. That is not the situation at all. Neither is it the introduction, the situation of an introduction in a real estate agency. The plaintiff says that Mr. Plant knew perfectly well whom he wanted to see. He wanted to see these two men, and he wanted to have them put in a proper frame of mind in order that he could deal with them. Substantially what the plaintiff says Plant wanted was that this man, or these men, should be put in such a frame of mind that they should say to Mr. Plant, ' We want to see you,' and it was that in form what (*sic*) he was hired to do. Now, that is the thing he was hired to do, as he says in each of the counts of his declaration."

In this part of his charge the judge was not instructing the jury as to the meaning of the word "introduce" as that word had been used by the plaintiff in his testimony. If the judge had given the instruction set forth above in that connection, it would have been error. What the judge was doing (in this part of his charge) was explaining to the jury what the plaintiff's declaration meant. And the defendant so understood it; for his exception in this connection was "to your honor's ruling defining the word ' introduction ' as used in the declaration." Both the presiding judge and the defendant were wrong in assuming that the word "introduction" or the word "introduce" was used in the declaration. The declaration has been set forth above and neither word is to be found in it. But that is a matter as to which the defendant was at fault as well as the judge, and as to which he was as much at fault as the judge. It is proper for the judge to instruct the jury as to the meaning of words in the pleadings; and the allegations of the declaration were in substance what the judge told them they were on the assumption that the word "introduced" was used in it.

The defendant also "excepted to the definition of the word ' introduced ' as given in the charge." In addition to the part of the charge set forth above the judge told the jury this: "In the first count he says that he was to be compensated at the rate of five per cent if he introduced Mr. Plant to these two men, and bear

in mind now that I am going to use hereafter this short cut, under-
standing what I mean when I use the simple word of ' introducing '
that he was simply to introduce Mr. Plant." That was an explana-
tion of the word "introduce" as the judge proposed to use that
word in his charge. The judge thereafter used the word "in-
troduced" in further explaining the declaration. To that no ex-
ception could be taken. The only other instance in the charge
where the judge used the word "introduction" was when he told
the jury: "It may be of consequence precisely what it was that
he undertook to do. It is for you to say whether it is made clear
to you precisely what he did undertake to do. He himself says
it did not mean simply an introduction such as one man gives
another, 'Mr. Clark, this is Mr. Smith,' 'Mr. Plant, this is Mr. Bar-
bour,' it does not mean that, it means something more. What
does it mean? What was the contract? What was he to do?
He has stated and his counsel have stated to you what he was to
do. It is for you to say what he was to do, and it is then for you
to say, Did he do that which he undertook to do." There was no
error in that. Both these exceptions must be overruled.

3. The next exception is to a question of evidence. Barbour
testified that at the first meeting between the defendant and
Barbour (i. e., on the afternoon of Friday, July 22) the question
of Smith's compensation was discussed; that Barbour told Smith
that if through any scheme evolved by him the differences be-
tween the Shoe Machinery Company and the Wonder Workers
could be adjusted he was sure that he (Smith) would be compen-
sated by the Shoe Machinery Company, and that Plant said
he would be willing to contribute. Plant, the defendant, corrobo-
rated this testimony and denied that he had the conversation
testified to by the plaintiff as having occurred while he and the
plaintiff were in a cab on their way to Barbour's office on Satur-
day morning. Barbour when on the witness stand was examined
as to a statement prepared by the plaintiff and submitted by
him in person to Barbour, in which the conversation as to the
plaintiff's compensation testified to by Barbour as having taken
place on the afternoon of Friday, July 22, was not stated and the
pre-arranged dialogue of Saturday morning testified to by the
plaintiff was set forth; on cross-examination Barbour denied
the accuracy of the statement in both particulars. Upon re-direct

examination the defendant offered two letters written to him by Barbour on September 30, 1910, and January 25, 1911, giving an account of the interviews of July 22 and 23, which corroborated Barbour's testimony. They were excluded and an exception taken. Later, the plaintiff, being recalled to the witness stand, testified that he presented this statement to Barbour and "asked him to check off what was true, and that Barbour checked it off, line by line." The paper was then offered and admitted in evidence. The defendant did not then again offer in evidence Barbour's two letters to the defendant dated September 30, 1910, and January 25, 1911. It is, therefore, apparent that when the consistent statements contained in these two letters of Barbour were excluded, no contradictory statements by Barbour had been put in evidence. The defendant therefore is forced to go the length of contending that whenever from the cross-examination of a witness it is apparent that the other party intends to attack his testimony, the party calling the witness for the purpose of corroborating the witness's testimony can introduce in evidence previous statements made by him which are to the same effect as the testimony given by him on the witness stand. For that proposition no authority has been or can be cited. It is the rule in some jurisdictions that similar statements may be introduced in evidence to corroborate the credibility of a witness which has been attacked by proof of statements made by the witness which contradict the testimony given by him on the witness stand. But that is not the rule in this Commonwealth. The subject was considered at length in *Commonwealth* v. *Tucker*, 189 Mass. 457, and the rule adopted in *Commonwealth* v. *Jenkins*, 10 Gray, 485, was re-affirmed. That rule is that evidence of consistent statements out of court does not help the credibility of a witness when his credibility has been attacked by proof of contradictory statements. To the general rule there are two limitations, namely, (1) where it is shown that at the time of giving his testimony the witness is under a bias or in such a situation as to put him under a moral duress to testify as he does, and (2) where the witness is impeached by showing that he formerly withheld or concealed the facts testified to at the trial. In these two cases evidence of former consistent statements is admissible to meet the inference growing out of

those special conditions. In the case at bar not only did neither of these special situations exist, but no evidence of contradictory statements had been introduced in evidence. This exception must be overruled.

4. The last exception is also one as to a question of evidence. On cross-examination the defendant was asked whether he had prepared a statement of his talk and negotiations with the plaintiff. He said that he had. The plaintiff's counsel then asked him to look at it and find the part where he first made a note of his call on Barbour on July 22. The defendant did so. The plaintiff's counsel then asked him: "Did you then make note of your call at his office the next morning?" The defendant said he did. The plaintiff's counsel then asked him: "Did you then, after you made note of the call on the morning of July 23rd, make note of the talk with Mr. Smith about compensation — please look at your memorandum." To which the defendant answered: "Have n't got anything on the subject." Question: "Anywhere in the notes?" Answer: "Not on the 23rd." Question: "I ask you if this is n't the way in which your notes take up these events. You state first the meeting at Col. Barbour's the 22nd? A. That states second. Q. The meeting of Barbour on the 23rd, and they state the third, talk with Smith about compensation. Is n't that true? Mr. Morse: I think as long as you have asked him so many questions the shortest way is to read it. A. I will have to read it to ascertain — Q. Look it over. A. The sequence of events? Q. If your notes do not place these three events in this order — first, the talk with Mr. Barbour on the 22nd; second, the talk with Mr. Barbour on the 23rd; and third, the talk with Smith about compensation." The defendant objected to the question as a question as to the contents of a written paper. The judge admitted the question and an exception was taken. The witness then testified: "My notes, first the meeting with Mr. Barbour and what occurred there and the compensation was brought up at that meeting; nothing said about the third meeting — Q. Then the second meeting? A. The second meeting follows the evening at the hotel with Mr. Smith. Q. And then the meeting at Col. Barbour's the next day? A. The meeting of Col. Barbour — no, sir. It completes the meeting at Col. Barbour's the first day and as to what was said at the end of the

meeting; and then continues along to the next day. In other words, gives the sequence of the interviews and the first and second interview at Col. Barbour's." Counsel for the plaintiff then said: "That answers the question," and passed on to another matter.

On re-direct examination the defendant offered this statement in evidence, counsel for the defendant stating that "the paper was called from my possession and he has been cross-examined upon it; that makes the paper clearly admissible." To which counsel for the plaintiff answered: "I did not call for it; I was questioning the witness as to his memory and not getting the responses I expected; I asked him whether he had made any memorandum and then he said he had and it was in Mr. Morse's possession. I did not ask for the paper to be given to me, but I asked him to refer to it to refresh his recollection and then I asked him about the order of events, the order of three events. That is all I did, and it does not seem to me it makes the paper admissible now." Thereupon the presiding judge said that he should adhere to his former ruling, the statement was excluded and an exception taken.

The plaintiff now seeks to sustain both rulings on the ground that he did not seek on cross-examination of the defendant to put in the contents of the statement but to get him to refresh his recollection by consulting it and then to testify with his recollection so refreshed. The same contention was made by counsel for the plaintiff when the statement was offered in evidence on re-direct examination of the defendant, and the presiding judge seems to have acquiesced in it. But this view of the use of the statement on the plaintiff's cross-examination of the defendant is untenable. The plaintiff's counsel did not ask the defendant after refreshing his recollection by looking at his memorandum to testify to the sequence of the three events, namely, the conversation of July 22, the conversation of July 23, and the conversation as to the plaintiff's compensation. What was asked by the plaintiff was what was the sequence of these three events as noted in the memorandum. The purpose of the questions was not the recollection of the witness refreshed by the statement, but the contents of the statement. It is manifest that the plaintiff's hope was that the three events were "placed" in that order

in the statement and if they were it would lay the foundation for an argument that they occurred in the order in which they were "placed" in the statement and that in this way the statement contradicted, to some extent at least, the story told by Barbour as well as by the defendant and corroborated the plaintiff's story. The defendant's objection to the questions asked by the plaintiff as questions calling for the contents of a written paper was well taken and should have been sustained.

But we are of opinion that the defendant was not harmed by the ruling. A copy of the defendant's statement which was excluded is annexed to the bill of exceptions. From an inspection of it it appears that the defendant's testimony as to the order in which the three events were set forth in the statement was correct. The order of the three events, as they were noted in the statement, accorded with the secondary evidence of it given by the defendant on the witness stand. Since the plaintiff had been allowed to put in the contents of the statement so far as the order of the three events was concerned, the defendant would have been entitled to put in evidence that part of it which showed the order in which they were noted in it. But the defendant did not ask to have that done. What he did ask to have done was to have the whole statement put in evidence. The whole statement covers four printed quarto pages of the record. That the defendant was not entitled to.

The entry must be

*Exceptions overruled.*

*R. M. Morse, (W. H. Dunbar, E. F. McClennen & J. R. Lazenby* with him,) for the defendant.

*C. F. Choate, (J. L. Hall* with him,) for the plaintiff.