JAMES D. HENDERSON & SON, INC. *vs.* JAMES J. AXELROD
& another.

Suffolk.   October 5, 1959. — December 8, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, &
WHITTEMORE, JJ.

*Broker,* Commission.  *Agency,* What constitutes.

In an action by a broker against the owners of a mill in a city for a com-
mission for procuring one who ultimately became a lessee of space in
the mill after a period of negotiations, where the plaintiff did not
claim to have had any direct authority from the defendants to act as
their broker, the plaintiff's contentions were not supported by evidence
not warranting a finding that the defendants authorized the executive
director of a city committee, the function of which was the industrial
promotion of the city, to hire the plaintiff as the defendants' broker,
or that subsequently the defendants themselves or through authorized
agents recognized the plaintiff as their broker, or that they accepted
services of the plaintiff respecting the leasing.

CONTRACT.   Writ in the Superior Court dated March 7,
1957.

At the trial before *Brogna,* J., the judge directed a verdict
for the defendants on the first count of the declaration; and
the jury found for the defendants on the second count and
for the plaintiff on the third count.

*Thomas D. Burns & Lee H. Kozol,* for the defendants.

*Philip E. Tesorero,* for the plaintiff.

WHITTEMORE, J.   This is an action for a broker's commis-
sion for the leasing of space in the Wood-Ayer Mills in Law-
rence.   These are the plaintiff's exception to the direction of
a verdict for the defendants under count 1 which set out an
express contract, and the defendants' exceptions to the de-
nial of their motion for a directed verdict under count 3,
which declared on an account annexed, and also to parts of
the charge.   The jury found for the defendants under count 2.

The plaintiff does not contend that it had direct authorization from the defendants to act as their broker and bases its case on an implied authority in John J. O'Malley, the executive director of the Lawrence Development and Industrial Committee (the Committee), to bind the defendants, and on acts or statements of alleged ratification or acceptance of services in the course of negotiations.

These facts could have been found:

The function of the Committee was the industrial promotion of Lawrence. The defendants talked with O'Malley in January, 1956, about the rental and development possibilities of the Wood-Ayer Mills in which the defendants then had a financial interest and which they were thinking of buying. O'Malley told the defendants that when such a property is on, or about to be on, the market he lists it with brokers, and on lists which are sent to industrial firms and with "any source who could possibly turn up an industrial tenant."

About April 17, 1956, the plaintiff's representative, Jonas Leathers, arranged by telephone with O'Malley to bring to Lawrence, on April 19, Robert Sumberg and another, both representatives of Avco Manufacturing Corporation (Avco), which, on June 21, 1956, became the lessee. O'Malley told Leathers there was space available in the Wood-Ayer Mills and that "upon the understanding I had from the owners this property could be shown." Thus, he "listed" the property with the plaintiff. On April 19, Leathers, the Avco men and O'Malley visited the Wood-Ayer Mills and two other properties. None of the Avco organization had seen the Wood-Ayer Mills before. The plaintiff had begun its negotiations with Avco in October, 1955.

A day or two after April 19, O'Malley told the defendant Axelrod that "the Henderson people had brought the Avco Corporation to Lawrence." Axelrod said that Mr. Kozol (the defendants' attorney in the matter of the possible purchase of the mills and the rental of space therein) would handle the negotiations. O'Malley testified that this was in response to O'Malley's asking whether "Henderson or

Mr. Kozol or who should handle the property." Following that, O'Malley called Mr. Kozol and "mentioned . . . the interest of . . . Henderson in the Avco company." O'Malley testified that Mr. Kozol told him that A. A. Franks (a friend of Axelrod who had an interest in Pacific Mill No. 10 in Lawrence) would handle the lease. O'Malley told Franks by telephone of Sumberg's visit, and also told the defendant Linsey of it about the same time. On April 23, O'Malley wrote Franks that "After our phone conversation of this afternoon I got ahold of Mr. Leathers at the Henderson Company who reported that he had not been in contact with the Avco people since last Friday afternoon. . . . I plan to contact . . . [Sumberg] Tuesday and see if I can still work something out." On April 27 Sumberg, O'Malley and Franks met in Lawrence with Avco engineers who came to look at Pacific Mill No. 10 and the Wood-Ayer Mills. When Avco turned down Mill No. 10 Franks tried to interest Avco in the Wood-Ayer Mills. Terms of possible leasing were discussed. Negotiations continued thereafter until the signing of the lease. The defendants took title to the property in the name of a straw on May 4, 1956.

"O'Malley and Franks were trying to help . . . [Axelrod] find new tenants." Axelrod "knew at some time that Kozol and Franks were talking with brokers on my behalf to obtain tenants for this property." He testified that he never gave Mr. Kozol or Franks authority to hire brokers; he never told them not to, or "not to talk to brokers to secure tenants." He had to rely on others to negotiate leases and did rely on Mr. Kozol and Franks.

During the negotiations Robert L. Henderson, the plaintiff's president, called Franks once and asked how the negotiations were going with Avco. About May 18, Mr. Kozol by telephone said to Henderson "[Y]ou are going to have to bear down on the Avco people . . . if you want a deal here" and mentioned certain of their demands which Mr. Kozol said could not be met at a rental of thirty-five cents or forty-five cents a foot. Henderson said he "would immediately go to work on that aspect of it." He telephoned

Mr. Kozol about May 21 and told him he had been unable to reach Sumberg and hoped to do so. He suggested that the owners raise the proposed rent to meet Avco's demands. Mr. Kozol told Henderson, "around May 18, that they could no longer recognize me as broker in this transaction because Al Franks was the broker." Henderson took no part in the negotiations but he tried to do so. He asked Mr. Kozol if he might be present when Avco came to Boston to negotiate "on the beginning of the lease." Mr. Kozol replied, "I cannot recognize you as the broker. Al Franks is the broker in this deal." Henderson after calling Sumberg called Franks and said, "I understand that you have been negotiating with Avco with regard to the Wood-Ayer Mill. Frank Kozol tells me you are the broker. I didn't realize you were in the real estate business. My office had been negotiating with them. This is causing me a great deal of inconvenience." Franks said, "You and I have both been around Boston a long time, Bob. Let's not worry about this thing. Let's get a deal first and we will straighten it all out afterwards." Henderson also talked with O'Malley and asked him "if he had from the beginning protected our position as brokers with particular reference to the new owners of the . . . Wood-Ayer Mill. He said he had." This testimony by Henderson was struck "in so far as it is any evidence that . . . [O'Malley] had any authority to protect the interests of this plaintiff with the owners." Sometime in May Henderson learned that Sumberg was going to be in Mr. Kozol's office. He telephoned Sumberg there, was told that Sumberg was in conference, and left a message that he wanted to talk to Sumberg. Sumberg told him on June 27 he did not receive the message.

In June R. M. Bradley & Co. Inc. came into the negotiations for the owners.

Early in June or at the meeting for signing the lease, Sumberg asked Mr. Kozol about Henderson and was told "Don't worry, we'll take care of Henderson"; Sumberg asked Mr. Kozol, "What about Mr. Henderson . . . would [Avco] be required to pay any commission to any broker?" He was

told that "the rental that we would pay would have to include any commission cost."

We think this evidence did not warrant sending the case to the jury under any count. *Cook* v. *Welch*, 9 Allen, 350. *McKeon* v. *Tyler*, 254 Mass. 142, 144. *Yurgelun* v. *Emery*, 282 Mass. 571, 572. *Johnstone* v. *Cochrane*, 231 Mass. 472, 479. *Wm. Pease O'Brien Inc.* v. *American Radiator & Standard Sanitary Corp.* 322 Mass. 242. *Field* v. *Hamm*, 254 Mass. 268. *McAuslan* v. *Nolan*, 254 Mass. 363. *Barton* v. *Powers*, 182 Mass. 467. See *Cronin* v. *National Shawmut Bank*, 306 Mass. 202, 210. Compare *Maxwell* v. *Massachusetts Title Ins. Co.* 206 Mass. 197; *O'Malley* v. *Markus*, 339 Mass. 766.

O'Malley had no authority from the defendants to engage a broker. His principal was the city of Lawrence. We assume that such a director of a development committee could lawfully act as the agent for others than the city in engaging for them the services of a broker. There is, however, as the judge correctly charged, no basis for implying such an agency in what happened between O'Malley and the defendants. The defendants by speaking with O'Malley did no more than make use of a public agency to get information to brokers, who might have, or take steps to secure, authority to act from someone who would pay a commission.

The plaintiff takes no benefit from O'Malley's statements to the defendants. He made no offer of the plaintiff's services. The defendants learned from O'Malley that the plaintiff had served Avco and that O'Malley wanted to know if the plaintiff was, or was to become, the defendants' agent. There was no implication in this that the plaintiff's men thought that it was the defendants' agent or were, through O'Malley, soliciting authority to act.

It is immaterial that Henderson may have believed that the defendants knew he wanted the plaintiff to be their broker. The defendants could not be charged with this knowledge in the absence of any solicitation from the plaintiff or of any statement from others of the plaintiff's mis-

apprehension. They violated no obligation in proceeding with the negotiations without disavowing to the plaintiff an intention to employ it. In the circumstances it was reasonable to conclude that the plaintiff, if it remained active, was in the employ of Avco. It is not unheard of or unreasonable for a prospective tenant or purchaser to have a broker working for it. See *Gordon* v. *First Universalist Soc. of Marlborough,* 217 Mass. 30; *Carpenter* v. *Fisher,* 175 Mass. 9; *Barton* v. *Powers,* 182 Mass. 467. Accepting Henderson's testimony, his reliance on the assumption that an engagement to the defendants had been made by O'Malley shows why there is a controversy, but even if that testimony had remained in the case for all purposes it would not have shown that any rights against the defendants had arisen.

No obligation resulted from the Henderson-Kozol conversation "[a]bout May 18." Henderson knew on May 18 that the defendants knew that the plaintiff had come into the matter with Avco and without any kind of authorization from the defendants. He knew also that the plaintiff had for about three weeks not sought or received any express authority to act for the defendants. In the circumstances, a belief that Mr. Kozol in speaking to him was recognizing him as the defendants' broker could have been reasonable only on the assumption that he had become engaged to the defendants through O'Malley. The defendants could not be found responsible for such mistaken assumption or bound because Henderson made it.

There is an additional reason why Henderson's efforts after May 18 are not significant. Although the jury were not obliged to believe Mr. Kozol's testimony that he had initial information from Leathers that the plaintiff represented Avco and that he spoke accordingly with Henderson, they could not weigh Henderson's acts after May 18 without accepting as proved the fact that "around May 18" Henderson, as he testified, knew that Mr. Kozol was not recognizing the plaintiff as the broker. There is no contrary testimony. Even if there were it would be of questionable relevance as the immediate issue is what did Henderson

understand from his talk with Mr. Kozol and have in mind when he tried to spur Avco to a trade. His is the only and final word on that. *McFaden* v. *Nordblom,* 307 Mass. 574, 575, and cases and text cited. *Fraser* v. *Fraser,* 334 Mass. 4, 6. *Gambardello* v. *H. J. Seiler Co.* 335 Mass. 49, 52. The reasonable construction of Henderson's full testimony on the subject may be that his second account of what Mr. Kozol said was the more accurate one and that the only and the exact words spoken were "I cannot recognize you as the broker." But if we assume that the first stated words were also spoken ("could no longer recognize"), the result is not affected. Mr. Kozol's words cannot be taken to confirm prior recognition, as none such could be found in word or conduct.

In the circumstances, neither the cryptic statement attributed to Mr. Kozol "We'll take care of Henderson" nor Franks's words "Let's get a deal first and we will straighten it all out afterwards" could be taken against the defendants as recognition of a right in the plaintiff against them. We note additionally that Mr. Kozol's statement was not made to the plaintiff and does not appear to have been reported to or acted on by it. We need not determine the extent of the authority of Franks or of Mr. Kozol.

There is no evidence of a usage on which recovery could be predicated. See *Cook* v. *Welch,* 9 Allen, 350. Compare *Loud* v. *Hall,* 106 Mass. 404.

We see nothing to support the possibility referred to in the charge that there was an implied engagement or an acceptance of the services of the plaintiff as an aid or "middleman" in advancing to a successful conclusion a trade to be made directly between the owners and the customer. See *Rupp* v. *Sampson,* 16 Gray, 398; *Tracey* v. *Blake,* 229 Mass. 57, 60.

*Plaintiff's exceptions overruled.*
*Defendants' exceptions sustained.*
*Judgment for the defendants.*