HASKELL BLOOMBERG *vs.* GREYLOCK BROADCASTING COMPANY & another.[1]

Middlesex.    March 6, 1961. — May 3, 1961.

Present: WILKINS, C.J., WILLIAMS, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Broker*, Commission. *Contract*, With broker. *Corporation*, Officers and agents. *Agency*, Scope of authority or employment, Ratification. *Evidence*, Distortion of evidence, Relevancy and materiality, Correspondence. *Practice, Civil*, Exceptions: waiver, renewal of exception; Charge to jury.

In an action for a broker's commission on a sale by the defendant, a corporation, of a television station to the operator of another station, evidence warranted a finding that the defendant employed the plaintiff merely to arrange a contact between representatives of the defendant and of the operator of the second station and not to conduct negotiations, and that the plaintiff became entitled to a commission by bringing about a conference between their representatives which led to negotiations ultimately culminating in the sale.   [547–548]

One who was president, assistant treasurer, a director, manager, and the "largest . . . although . . . not the majority stockholder" of a corporation had no authority merely by virtue of his offices to sell or to employ a broker to assist in selling the business of the corporation or a substantial part of the assets needed for the conduct of its business.   [548]

At the trial of an action to recover a broker's commission on a sale by the

1 Leon Podolsky.

defendant, a corporation, of a television station to the operator of another station, testimony by the plaintiff that in telephone conversations with the executive officer of the defendant he was instructed to make contact with the operator of the second station and was promised a commission if a sale should be consummated, and testimony by such officer, despite his denial of having had such conversations, that in dealings with the plaintiff he always acted "as an officer of the corporation" and on its behalf, that he reported everything to its board of directors and "kept the board . . . in full knowledge of what he was doing with the plaintiff," warranted a finding that the directors of the defendant had knowledge of, and did nothing to repudiate, the officer's arrangements with the plaintiff and ratified them, even though there was no formal vote of the directors.    [548–550]

A broker employed merely to arrange a contact between an owner of property and a certain prospective purchaser thereof, and promised a commission if a sale ensued, need not show that he was the predominating cause of a sale ultimately resulting from such contact.    [550]

An exception to failure to give a correct request for instructions at the trial of an action was waived where the judge gave substantial additional instructions relating to the subject matter of the request and the requesting party thereupon did not renew the exception nor request still further instructions.    [550–551]

At the trial of an action to recover a broker's commission from the defendant on a sale of property, there was no error in the admission of letters from the plaintiff to a prospective purchaser showing what the plaintiff did to carry out his instructions, or in the admission of a letter from him to the defendant constituting a part of the correspondence between them although it contained self serving statements not specified as a ground of objection.    [551]

CONTRACT.    Writ in the Superior Court dated July 10, 1957.

The action was tried before *Nagle, J.*

*Foster Furcolo & Paul R. Sugarman,* for the defendant Greylock Broadcasting Company.

*Joseph B. Abrams,* (*Robert T. Abrams & Robert J. Sherer* with him,) for the plaintiff.

CUTTER, J.    This is an action by Bloomberg to recover a broker's commission in connection with the sale of a television station by a Massachusetts corporation (Greylock). There were verdicts for the defendant Podolsky, president of Greylock, on the counts against him, and for Bloomberg against Greylock in the sum of $20,761.53 upon one of two counts in contract against it.    In that count Bloomberg alleged (a) that "it was orally agreed that . . . Greylock

. . . would pay . . . [him] a five per cent . . . commission on the gross sales price of . . . WMGT-TV . . . if the sale was consummated with a prospect [with] whom . . . [he] would [make] contact"; (b) that to this prospect a sale was "finally" made; and (c) that, under the arrangement with Bloomberg, "all details as to price and terms were to be handled by . . . Podolsky." There was a verdict for Greylock on the other count against it. It was stipulated that in 1955 and 1956 Greylock operated the television station and a radio station and, in February, 1957, pursuant to an agreement dated November 29, 1956, sold WMGT-TV for $379,206 to Hudson Valley Corporation (Hudson) which operated a television station in Albany. A five per cent commission would be $18,760.30.

The case is here on Greylock's exceptions (a) to the denial of its motion for a directed verdict and to the judge's refusal to enter a verdict for it under leave reserved, (b) to the refusal of instructions, and (c) to rulings on evidence. The evidence is stated in its aspect most favorable to Bloomberg.

Bloomberg, during November and December, 1955, initiated correspondence and meetings with Podolsky, president, assistant treasurer, one of five directors, manager of the corporate business, largest individual stockholder, and "executive head" of Greylock. Bloomberg at first was primarily interested in the sale of Greylock's radio station but soon considered the possibility of selling its television property. Podolsky made it clear to Bloomberg that "any sale would have to be approved by the board of directors." Bloomberg, as a lawyer who had "represented corporations," understood "the 'set-up' of a corporation."

On January 23, Bloomberg had a telephone conversation with Podolsky who told him to "sell WMGT-TV.[2] . . . We

[2] On January 11, 1956, Bloomberg wrote Podolsky "that I am working on the possibility of the sale of WMGT-TV independently of your [r]adio [s]tation . . . and would like a word of approval from you with reference to my efforts concerning WMGT-TV." Podolsky testified that he had not received this letter, or another letter from Bloomberg dated February 7, 1956, thanking Podolsky for the "lead [Hudson] which you gave me" on the sale of the television station and "your assurance that my 5% fee would be taken care of." Carbon copies of these two letters, however, were admitted solely "to affect the credibility of Podolsky."

owe . . . $170,000 . . . [and] $200,000. No reasonable of-
fer refused. . . . If we sell the station to a prospect whom
you produce, you will get your five per cent commission."
In a telephone talk on February 7, Podolsky told him to get
in touch with Hudson in Albany, to "make arrangements
for us to meet in [*sic*] the question of their buying our
[television] station . . . . [T]hat is all you have to do; I
will take care of everything else. I know more about it
than you do. I can't go to them because I am fighting
them tooth and nail on their application for Channel 10
. . . you've got to break the ice. . . . I need a broker as
an intermediary to act for me in this regard; there isn't
much that you have to do, get us together, get them to meet
with us. . . . You will get your five per cent if we ever
sell them the station. . . . The man for you to . . . [see]
is . . . Chapman."

Bloomberg wrote on February 7, 1956, the first of several
letters to Chapman of Hudson stating that he had "been
requested by a stockholder, with authority," to make con-
tact with him and offering to sell Greylock's television
station. Some of these letters were admitted subject to
Greylock's exception. Bloomberg received a reply from
Chapman dated February 22 mentioning "Frank Smith,
President of" Hudson, as the man to consider this matter.

During March and April, 1956, Bloomberg corresponded
and met with Podolsky and received from him promotional
material concerning both the television and radio stations.
On April 24, Bloomberg wrote to Smith concerning the pos-
sibility of a meeting to arrange "negotiations for . . .
[the] acquisition" by Hudson of Greylock's television sta-
tion. Two days later he received a telephone call from
someone "purporting to be Frank Smith" in which "the
television station was discussed and reference was made
to . . . [Bloomberg's] letter." No mention of the tele-
vision station appears in Bloomberg's memorandum of this
call although Bloomberg testified it contained "[w]hatever
was important in the conversation." "As a result of this
conversation . . . [Bloomberg] called Podolsky and told

him . . . that Smith wanted an appointment to discuss the matter of purchasing the . . . television station. . . . [He] told Podolsky that Smith would be available the following day . . . in New York . . . . Podolsky . . . was going to be in New York the next day and would . . . [see] Smith." Bloomberg "may have told Podolsky that Smith was interested in renting." Podolsky told Bloomberg "that he did not have to go; there was nothing more for him to do and that he had accomplished his purpose; if the station was sold he . . . would get his money." Bloomberg did nothing further to get in touch with Smith or "with reference to selling the [television] station to Smith." He "did not call Smith to check on what happened and Smith did not call him."

Podolsky, who already knew Smith but had not theretofore "talked with . . . [him] concerning the sale of Greylock's television facilities," then called Smith and arranged to meet with Smith in New York on April 26, 1956. This meeting took place and, according to Podolsky, Smith "talked . . . only about a rental" and "offered to rent the television . . . facilities." The next day Podolsky called Bloomberg "to tell him of the outcome of the conversation with Smith . . . as a matter of courtesy."

Later negotiations between Greylock and Hudson took place in October, 1956, after negotiations with others. Podolsky testified that he "did not call Hudson, but rather they called him." These negotiations culminated in the sale of Greylock's television station to Hudson. Podolsky kept Bloomberg informed of these negotiations and of the final sale. When Bloomberg learned of the sale, he wrote to Podolsky, "I shall, of course, expect my full commission of 5%."

There was testimony from Podolsky that he was acting on behalf of Greylock and that he kept the board of directors informed, and from Bloomberg that "Podolsky stated that he was the leading factor; that he went before the board and told them and they did what he wanted."

1. The brokerage arrangement which Bloomberg con-

tends was created was somewhat unusual.  If the jury
believed Bloomberg, they were warranted in finding that this
(see *Smith* v. *Plant,* 216 Mass. 91, 98) "was not the ordinary
case of a broker being employed to find a customer or make
a sale.  The customer to whom the defendant wanted to
make a sale was known to the defendant (the principal).
The defendant's difficulty . . . could have been found by
the jury to have been . . . that from a business point of
view it was not possible for him to . . . [open negotiations]
and that . . . he had employed the plaintiff to . . . [open]
them by bringing about meetings between him and the . . .
[prospective purchasers], after which he was to carry on
the negotiations and the plaintiff was to do nothing. . . .
[I]t was of no importance that the defendant told the plain-
tiff 'to give the matter no further attention' after he had
brought about the desired meetings and had done all that
he was employed to do."  Bloomberg's testimony about the
telephone conversations with Podolsky on January 23, 1956,
and in February, described essentially such an arrange-
ment.  See the somewhat similar situation in *Noble* v.
*Mead-Morrison Mfg. Co.* 237 Mass. 5, 14, 20–21, 26.  Even
under such an arrangement, the conclusion that the "right
to a commission was . . . dependent on the sale being the
result of his efforts . . . might be implied from the nature
of the plaintiff's employment."  See *Smith* v. *Plant, supra,*
at pp. 98–99.

We think that Bloomberg's evidence, if believed, would
warrant the jury in finding (a) that Podolsky, purporting to
act for Greylock, in January and February, 1956, employed
Bloomberg to arrange a contact between Podolsky and some
person representing Hudson; (b) that Bloomberg did bring
about the conference that took place on April 26, 1956; and
(c) that Bloomberg was not employed to conduct negotia-
tions with Hudson and, indeed, was excluded from those
negotiations.  The jury could reasonably conclude that the
negotiations, started in April, culminated in a contract of
sale in November, despite the circumstances that these nego-
tiations were not continuous and that negotiations with

others also went on in the interim. In determining whether there was evidence which would warrant a verdict for Bloomberg against Greylock, the only substantial question remaining is whether Podolsky was authorized by Greylock to employ Bloomberg as a broker.

Podolsky, as president, assistant treasurer, director, manager of the business and "largest . . . although . . . not the majority stockholder," did not have authority, solely by virtue of these positions, or any of them, to sell Greylock's business or such a substantial part of its assets, needed for the conduct of its business, as the television station or to employ a broker to assist in effecting such a sale. See *Horowitz* v. *S. Slater & Sons, Inc.* 265 Mass. 143, 147–148; *Horowitz* v. *State St. Trust Co.* 283 Mass. 53, 58–59; *Stoneman* v. *Fox Film Corp.* 295 Mass. 419, 424–427; Restatement 2d: Agency, § 52, comment c, § 73, comment b. See also *Hurley* v. *Ornsteen,* 311 Mass. 477, 482; *James D. Henderson & Son, Inc.* v. *Axelrod,* 340 Mass. 26, 30–31; note, 61 Harv. L. Rev. 867, 869. Cf. *Hartford* v. *Massachusetts Bowling Alleys, Inc.* 229 Mass. 30, 32–33; Restatement 2d: Agency, § 43. With respect to this sale of a major asset of Greylock, Podolsky's authority to make a brokerage contract with Bloomberg must be shown to exist by reason of express direct delegation of such authority or it must be established at least that the directors or a majority of them had knowledge of Podolsky's actions and approved of them or ratified them. See *Connelly* v. *S. Slater & Sons, Inc.* 265 Mass. 155, 157; *Kelly* v. *Citizens Fin. Co. of Lowell, Inc.* 306 Mass. 531, 532–534. See also *Kagan* v. *Levenson,* 334 Mass. 100, 104–105. Bloomberg had the burden of establishing facts which would warrant a finding that Podolsky's action was either authorized or ratified. *Tower* v. *W. C. Plunkett & Sons Co. Inc.* 321 Mass. 663, 664.

Bloomberg relies largely upon Podolsky's testimony that when he was writing to Bloomberg, he was always acting "as an officer of the corporation" and on behalf of Greylock; that he reported everything to the board of directors and "kept the board . . . in full knowledge of what he was

doing with the plaintiff.'' On the basis of this testimony, not a mere hearsay report of a declaration out of court (cf. *Gordon* v. *O'Brien*, 320 Mass. 739, 742–743), Bloomberg contends that Greylock's directors could have been found to have accepted the benefit of Bloomberg's services and to have ratified Podolsky's promise to pay a commission. See *Ross* v. *Colonial Provision Co. Inc.* 299 Mass. 39, 41; *Jackson* v. *Colonial Provision Co. Inc.* 314 Mass. 177, 179–180. See also *Eastern Paper & Box Co. Inc.* v. *Herz Mfg. Corp.* 323 Mass. 138, 142–143. Cf. Kempin, The Corporate Officer and the Law of Agency, 44 Va. L. Rev. 1273, 1284–1285, which refers to the *Jackson* case as ''stretching agency language out of all bounds'' on what this court then recognized was ''scanty'' testimony by an alleged agent himself.

We need not go to the extent of the holding in the *Jackson* case. Although the eventual sale of the television station by itself would not establish ratification by the directors (see *Connelly* v. *S. Slater & Sons, Inc.* 265 Mass. 155, 157), the jury could reasonably have concluded that Greylock's directors had knowledge of, and did nothing to repudiate, Podolsky's arrangements with Bloomberg, conduct from which could be inferred approval, acquiescence, or ratification. The jury, of course, could not be permitted unfairly to distort Podolsky's testimony, or to rely upon a part of it out of context, so as to attribute to him statements which he did not make. See *Marquandt* v. *Boston Y. W. C. A.* 282 Mass. 28, 31; *Berardi* v. *Menicks,* 340 Mass. 396, 400. Nevertheless, they could at the same time (1) refuse to believe Podolsky's testimony that he did not call Bloomberg by telephone in January and February to retain him to make contact with Smith, (2) believe Bloomberg's testimony that the telephone calls did occur, and (3) find, on the basis of Podolsky's testimony, that he reported to his board of directors all the significant dealings with Bloomberg, including the disputed telephone talks.

A formal vote of authorization was not necessary. See *Banca Italiana di Sconto* v. *Columbia Counter Co.* 252 Mass. 552, 558–559; *Kagan* v. *Levenson,* 334 Mass. 100, 104–

105.   The jury could believe that there had been ratification of Podolsky's act by Greylock's directors, despite the testimony of Mr. Phelps, the counsel, a director, and clerk of Greylock, that the "first time anything appeared upon Greylock's corporate records concerning a negotiation with Hudson" was in the minutes of a directors' meeting on November 5, 1956.   A verdict could not have been directed for Greylock.

2.   Greylock requested instructions (no. 9) that Bloomberg must show he was the predominating cause of the sale; and (nos. 11 and 12) in effect that there could be no recovery if the negotiations "had come to an end, and at a later date, through independent causes, the parties got together and the property was sold."

Request no. 9 could not have been given.   Bloomberg need not have been the predominating cause of the sale in order to recover upon the limited contract of employment to which he testified if the sale was the result of his doing what he said he was employed to do.   *Smith* v. *Plant,* 216 Mass. 91, 98–99.

There were negotiations with others than Hudson between April, 1956, when Bloomberg arranged the meeting between Podolsky and Smith, and November, 1956, when the sale contract with Hudson was made.   Podolsky testified that the television facilities were not placed on sale until August 21, 1956, and that final negotiations with Hudson grew out of a new call from Smith in October, 1956. It was open to the jury to conclude that Bloomberg's contact with Smith resulted only in the April discussion of renting Greylock's television facilities, that the April negotiations were abandoned, and that the chain of causation (see *Noble* v. *Mead-Morrison Mfg. Co.* 237 Mass. 5, 20) was broken before negotiations for a sale began in October, 1956.   Greylock thus was entitled to have the jury instructed in accordance with the substance of requests nos. 11 and 12.   See *Kacavas* v. *Diamond,* 303 Mass. 88, 92; Restatement 2d: Agency, § 448, comment d.

The trial judge, in the course of additional instructions

to which no exception was taken, did tell the jury that they must find "that there was a contract of employment . . . [and] that . . . [Bloomberg] did what he agreed to do [that is, to] make the contact." He also charged that if they "find further, *as a result,* negotiations followed which culminated in the sale of the station, then the plaintiff is entitled to recover" (emphasis supplied). The trial judge thus said that there could be recovery only if the jury should find (1) that Bloomberg was employed to arrange a contact between Podolsky and Smith, (2) that negotiations resulted from that contact, and (3) also that the sale of the television station grew out of those negotiations. Requests nos. 11 and 12 expressed much the same idea negatively (instead of affirmatively) by stating that the plaintiff could not recover if negotiations "had come to an end" between the contact arranged by Bloomberg and the sale. We need not decide whether the substance of requests nos. 11 and 12 was implicit in the judge's additional instructions, and perhaps also in a part of the original charge. In any event, after the additional instructions the defendant gave no indication to the judge that it was not satisfied with them. This it could have done by further exception or a request for still further instructions. It did neither. The judge reasonably could have felt that he had complied with Greylock's requests. See *McCart* v. *Squire,* 150 Mass. 484, 488; *Cozzo* v. *Atlantic Ref. Co.* 299 Mass. 260, 268–269; *Thornton* v. *First Natl. Stores, Inc.* 340 Mass. 222, 225–226 (but cf. pp. 226–227). Cf. *Horowitz* v. *Bokron,* 337 Mass. 739, 746; *Decoteau* v. *Truedsson,* 339 Mass. 759, 762–763.

3. Letters of February 7, and February 16, 1956, from Bloomberg to Chapman of Hudson, admitted subject to Greylock's exceptions, were competent to show what Bloomberg did to carry out Podolsky's telephone requests that Bloomberg bring about a meeting with representatives of Hudson. A letter of March 3, 1956, from Bloomberg to Podolsky was part of an exchange of correspondence. If part of it was self serving, that circumstance was not specified as a ground of objection. See *Bouchard* v. *Bouchard,*

313 Mass. 531, 536–537, *Mishara* v. *Albion*, 341 Mass. 652, 660. Nothing in a letter of February 22, 1956, from Chapman to Bloomberg was of sufficient significance to be prejudicial.

It was within the judge's discretion to exclude as too remote testimony on direct examination about Greylock's contacts prior to 1955 with Columbia Broadcasting System, with which Hudson was affiliated. There was no adequate offer of proof or indication of the relevance of the inquiry.

*Exceptions overruled.*